Filed 8/3/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| TRACY HAYWARD,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF NAPA COUNTY,<br><br>    Respondent;<br><br>JOSE OSUCH,<br><br>    Real Party in Interest. | A144823<br><br>(Napa County<br>Super. Ct. No. 26-55470) |

The issues in this matrimonial case arise from the failure of an attorney serving as a temporary judge pursuant to article VI, section 21,[1] of the California Constitution to disclose grounds for her disqualification in the manner required by a canon of the Code of Judicial Ethics[2] applicable specifically to temporary judges. After the temporary judge had served for about two years, petitioner wife first learned that the judge had not disclosed "in writing or on the record" professional relationships she had had with lawyers in the present proceeding, as required by canon 6D(5)(a) and rule 2.831(d) of the California Rules of Court.[3] Petitioner filed in the superior court a statement alleging grounds for disqualification, to which the temporary

---

[1] Article VI, section 21 of the California Constitution provides that "On stipulation of the parties litigant the court may order the cause to be tried by a temporary judge who is a member of the State Bar, sworn and empowered to act until final determination of the cause."

[2] Unless otherwise indicated, all subsequent citations to canons refer to the California Code of Judicial Ethics.

[3] Unless otherwise indicated, all subsequent citations to rules refer to the California Rules of Court.

1

judge failed to respond in accordance with statutory procedure. The presiding judge of the superior court ordered the temporary judge disqualified, holding that she was deemed to have consented to her disqualification as a result of her failure to file a consent or verified answer. The case was reassigned to a superior court judge and discovery proceeded.

The present writ petition was filed to challenge certain of the trial court's discovery orders and its decision to delay a hearing on petitioner's motion to set aside orders previously made by the disqualified temporary judge. Pursuant to our order, proceedings in the trial court have been stayed. The questions presented to us all relate to whether the rulings made by the temporary judge prior to her disqualification are void or voidable and, if so, the legal consequences.

As will be seen, our resolution rests heavily on the temporary judge's failure to either consent to disqualification or answer the statement of disqualification. The temporary judge's failure to contest the claims that she failed to disclose in writing or on the record, and also that she was biased and prejudiced against petitioner, means that those factual allegations must be taken as true, and she was therefore automatically disqualified. (See discussion, *post*, at pp. 27-31.)

We shall find that (1) the rulings and orders issued by the temporary judge are all void and must be vacated; (2) the settlement agreement signed by the parties prior to disqualification of the temporary judge was tainted by the disqualifying conduct of the temporary judge and therefore may not be enforced pursuant to Code of Civil Procedure section 646.6[4] and; (3) the conduct of the disqualified temporary judge did not taint the proceedings before the superior court judge who replaced her. Finally, we shall decline to decide whether the fees paid the temporary judge for services rendered in violation of ethical obligations must be refunded, because the temporary judge is not a party to this proceeding.

---

[4] All statutory references are to the Code of Civil Procedure unless otherwise indicated.

**FACTS AND PROCEEDINGS BELOW**

Petitioner, Tracy Hayward, and real party in interest, Jose Osuch married in 1996.[5] Tracy is the owner of The Perfect Puree of Napa Valley (PPNV), a fruit pureeing business in Napa County; Jose was employed by PPNV and in 2006 Tracy made him a one percent owner. The parties later separated and Tracy filed this petition for dissolution in 2011. Initially, Tracy was represented by Roger Lewis, but after she learned he was formerly the law partner of Robert Blevans, who represented Jose, she replaced Lewis with attorney John Munsill.

In January 2012, the superior court ordered Tracy to pay Jose $12,748 per month in temporary spousal support and, as additional temporary spousal support, 40 percent of any distributions or withdrawals from her businesses other than salary and other specified taxable income attributed to Tracy. The order also provided that if Tracy's tax payments exceeded her taxable obligations, she was required to claim a refund and pay 40 percent of the refunded overpayment to Jose as additional temporary spousal support.

*Appointment of the Temporary Judge*

In March 2012, the parties decided not to further litigate the case in the superior court and to stipulate to the appointment of attorney Nancy Perkovich as judge pro tempore— commonly referred to as a "private judge"[6] —pursuant to rules 2.830 through 2.834 of the California Rules of Court, which apply to attorneys appointed temporary judges at the request of the parties pursuant to article VI, section 21, of the California Constitution.

The stipulation provided that, subject to approval of the presiding judge of the superior court, Perkovich "may be designated as Temporary ('Private') Judge of the Superior

---

[5] As is customary in marital dissolution actions, we refer to the parties to the marriage hereinafter by their first names. (*In re Marriage of James and Christine C.* (2008) 158 Cal.App.4th 1261, 1264, fn. 1.) All other parties and counsel will be referred to solely by their last names. No disrespect is intended.

[6] The term "private judge" refers to a non-judicial officer who exercises judicial power and is selected and compensated by the parties either as a "temporary judge" pursuant to article VI, section 21, of the California Constitution, or as a "referee" pursuant to section 638.

Court for all purposes, including, without limitation, conducting settlement conferences and case management conferences, hearing any pretrial motions/Orders to Show Cause, and sitting as trial/long cause judge in this proceeding. The parties waive any conflict that may exist because Perkovich conducts settlement conferences and thereafter serves as the hearing and/or trial judge." The parties and their attorneys all signed the stipulation on March 28, 2012, and Perkovich signed an oath of office the next day; the order designating her temporary judge was signed by the Honorable Robert G. Stone, Presiding Judge of the Napa County Superior Court, on April 3, 2012, and filed on April 5, 2012.[7]

The Rules of Court provide that "[i]n addition to any other disclosure required by law, no later than five days after designation as a temporary judge . . . a temporary judge must disclose to the parties any matter subject to disclosure under the Code of Judicial Ethics." (Rule 2.831, subd. (d).) As Perkovich was designated a temporary judge on April 5, 2012, her disclosure was required to be made no later than April 10.

Canon 6D(5)(a), provides that in "all proceedings" temporary judges must "disclose in writing or on the record information as required by law, or information that is reasonably relevant to the question of disqualification under Canon 6D(3), *including personal or professional relationships known to the temporary judge . . . that he or she or his or her law firm has had with a party, lawyer, or law firm in the current proceeding, even though the temporary judge . . . concludes that there is no actual basis for disqualification*." (Italics added.)

Perkovich failed to comply with the foregoing requirement: She failed to disclose "in writing or on the record" any ground for disqualification even though she knew she, Blevans, and Munsill, had in the past served as private judges in each others' cases, i.e., that she or her law firm had professional relationships with lawyers in the proceeding before her. This information was required to be disclosed even if Perkovich concluded that

---

[7] Under the stipulation and order appointing Perkovich, the trial date set for May 21, 2012, was vacated and discovery was deemed closed as of April 21, 2012, except that either party could depose the other; after April 21, either party could file a motion to reopen discovery.

4

these relationships provided "no actual basis for disqualification," and the disclosure was required to be made "in writing or on the record." (Canon 6D(5)(a).)

Code of Civil Procedure section 170.3, which applies to temporary judges, allows the parties and their attorneys to waive a disqualification after a judge determines himself or herself to be disqualified and discloses the basis of the disqualification. (§ 170.3, subd. (b)(1).) Such a waiver must "recite the basis for the disqualification, and is effective only when signed by all parties and their attorneys and filed in the record." (*Ibid.*) Because Perkovich failed to disclose any grounds for disqualification in writing or on the record, much less to determine herself to be disqualified, neither party was called upon to waive or waived the disqualification.

Perkovich also failed to comply with a provision of the Rules of Court requiring a temporary judge to certify (in his or her oath of office or otherwise) "that he or she is aware of and will comply with applicable provisions of canon 6 of the Code of Judicial Ethics and the Rules of Court." (Rule 2.831(b).)

Although the stipulation and proposed order assigning Perkovich temporary judge was signed by the parties and their counsel late in March 2012, and filed with the court on April 5 of that year, the parties did not actually meet with Perkovich until seven months later, at the first settlement conference on October 30, 2012. As will be seen, Perkovich maintains that she verbally disclosed her personal and professional contacts with both Blevans and Munsill at the beginning of this conference, including that she had hired each of the attorneys as temporary judges in the past, and each of them had hired her. Tracy maintains that she did not hear or understand any such verbal disclosures, and did not learn of Perkovich's failure to disclose "in writing or on the record" until almost two years later, when her present counsel came into the case and requested information including Perkovich's disclosures, and Perkovich informed them of her verbal disclosures.

5

*Relations Between the Parties and Counsel Deteriorate*

On March 26, 2013, Tracy replaced Munsill with Trevor Jackson, a younger lawyer who did not limit his practice to family law.[8] Jackson was unaware Perkovich and Blevans designated each other as private judges in matrimonial cases in which one of them represented a party. Perkovich did not disclose her professional relationship with Blevans at any time during which Jackson represented Tracy.

Shortly after Jackson entered the case, relations between the parties worsened. The contentiousness was most evident at a July 30, 2013, hearing on Jose's motions requesting attorney and expert witness fees, payment of spousal support arrearages and restraints on Tracy's ability to take distributions from PPNV without Jose's consent or a court order. Assuming testimony and other evidence would be received at the hearing, Jackson brought Kevin Ziegler, the chief operating officer of PPNV, to testify as to the adverse effect on PPNV of the restraints Jose sought to impose on its distributions and Tracy's corporate decision-making, and expected to be able to cross-examine Darlene Elmore, Jose's expert, regarding her declaration. Jackson had given advance notice Ziegler would testify by naming him on his witness list, and he and Tracy were surprised when Perkovich refused to allow Ziegler or any other person to testify and stated her intention to rule on Jose's motions solely on the basis of the declarations, exhibits and pleadings. Perkovich barred testimony on the erroneous ground that the hearing was analogous to a law and motion proceeding.[9] Jackson objected repeatedly during the hearing, but to no avail.

Jackson also complained that though Tracy was the founder and owner of PPNV, whose assets Jose sought to examine and encumber, neither she nor the chief operating officer of the

---

[8] The substitution of attorneys was apparently Tracy's choice, not initiated by Munsill. When asked at his deposition why he was substituted out of the case, Munsill stated that he did not remember, but he recalled being surprised that he was being substituted out of the case.

[9] The rule of court defining "law and motion" excepts causes arising under the Family Code (rule 3.1103, subd. (a)(1)), and subdivision (a) of Family Code section 217, subdivision (a) provides that, with exceptions not here pertinent, on a motion brought pursuant to the Family Code "the court shall receive any live, competent testimony that is relevant and within the scope of the hearing."

company were allowed to testify at the hearing regarding its operations, cash flow, tax situation, or any other relevant matters. Instead, Perkovich allowed Blevans to submit a declaration determining the disputed financial issues based on his analysis of the company's tax returns. Additionally, with respect to attorney and expert witness fees, Perkovich appeared willing to rely solely on the declaration of Blevans, who (self-servingly in Jackson's view) characterized himself an expert on the subject, and to award fees to compensate for the costs of what in Jackson's view were unnecessary depositions and "law and motion" proceedings that had been pursued instead of negotiating an expeditious settlement. Jackson objected to requiring Tracy to pay Jose's attorney and expert witness fees before Jose was compelled to disclose the extent and nature of his independent assets.

Perkovich ordered Tracy to pay Jose $13,335 for his attorney fees, to advance him attorney fees in the amount of $100,000 payable in 60 days, and to pay expert witness fees of $35,000 to Darlene Elmore. After Jackson objected to the "abbreviated manner" in which the proceeding had been held, Perkovich went on to find that in 2011 and 2012 Tracy had taken distributions of $605,576 in excess of taxes attributable to PPNV and Hayward Enterprises, Inc. (HEI), another company she controlled, which provided sizable tax refunds that pursuant to court order should have been shared with Jose; ruled that Jose was entitled to 40 percent of this amount, or $242,230; and directed Tracy to pay him this amount, plus interest at 10 percent, as additional spousal support. Finally, Perkovich restrained Tracy from allowing or causing the withdrawal of any sums from PPNV or HEI for payment to her for her personal benefit.

Toward the end of the hearing, Jackson remarked on his "shock" at Perkovich's unexpected refusal to accept testimony he had planned to present. When he subsequently reiterated his objection to the lack of notice, Tracy interjected that Perkovich's failure to allow testimony "made you look like an idiot,"[10] adding that " '[m]y' COO is sitting right here and he

---

[10] The "you" in this remark leaves ambiguous whether Tracy was saying Perkovich or Jackson was made to look like an idiot. In a declaration submitted in support of Tracy's October 7, 2014, motion to disqualify Perkovich, Jackson described the remark as directed at Perkovich—"[Tracy] commented that Perkovich's one-sided approach 'made [her] look like an idiot,' " and stated that the comment "immediately set Perkovich off." Blevans's declaration also stated that this comment was directed at

could have cleared up many of these issues. How in the hell do you absolutely allow—." Perkovich cut Tracy off, stating "Your conduct is in contempt of court. You're disrespectful. You're in contempt." A colloquy ensued in which Perkovich complained that "in presenting your case . . . you see things only your own way," and Tracy heatedly insisted that Perkovich "never asked the questions" that needed to be asked "for the truth to be made known" about the manner in which she ran PPNV.

In a ruling she filed with the superior court less than two weeks later, on August 12, 2013, Perkovich belatedly recognized that, under Family Code section 217, subdivision (c), Tracy was entitled to an evidentiary hearing on some of the motions heard and decided on July 30. Perkovich vacated portions of her earlier decision and ordered that the motions for spousal support arrearages and property restraints be set for evidentiary hearing. The August 12 ruling modified the earlier decision primarily by increasing the amount of attorney fees Tracy was required to advance to Jose from $100,000 to $150,000, apparently to cover the costs of the newly ordered evidentiary hearing.[11]

### Tracy Tries but Fails to Remove the Temporary Judge and Jose Seeks to Wrest Control of PPNV From Tracy

Perceiving Blevans had an "inside track" to Perkovich's thinking and decision-making,[12] Jackson filed a motion in the superior court on September 5, 2013, to withdraw the stipulation and order, remove Perkovich as temporary judge, and reopen discovery. Unaware of

---

Perkovich. This interpretation appears to be most consistent with the strength of Perkovich's response.

[11] Tracy appealed the increased fee to this court on October 7, 2013, but later moved to dismiss the appeal, which was dismissed on February 18, 2014.

[12] In a declaration filed in support of Tracy's writ petition, Jackson provided written correspondence to him from Blevans assertedly supporting Jackson's view that Blevans expressed "great confidence that the paid private judge Nancy Perkovich would find in [Jose's] favor on most all issues or, alternatively . . . how Perkovich was feeling or thinking about various issues." For example, in a letter dated August 9, 2013, Blevans told Jackson he was "confident Judge Perkovich would find Jose's spousal support demand to be due and of course it would be ordered paid immediately and bear continued interest at 10%." In a letter to Jackson dated September 23, 2013, Blevans declared, "it is necessary that discovery be unambiguously 'open' for all purposes. This sentiment is shared by Judge Perkovich."

8

Perkovich's failure to disclose in writing or on the record her mutual judging relationship with Blevans as required by canon 6D(5)(a), Jackson based the motion instead on the inconvenience and expense of having a temporary judge based in Sacramento in a case in which Jose was "avidly pursuing litigation and discovery instead of settlement," and the fees of the temporary judge were certain to "skyrocket." The motion was denied on October 20, 2013.

Meanwhile, the evidentiary hearing was held on October 9, 2013. Much of the hearing focused on distributions Tracy took from PPNV. At the end of the hearing, Jackson expressed his exasperation about the irrelevant "minutiae" into which Blevans was delving, his manipulation of the facts, and the unreasonableness of the restraints he sought to impose on Tracy and the company. Insisting Tracy received no personal benefit from PPNV's tax payments and other distributions, Jackson argued that setting aside a large amount of corporate assets for Jose would not only cripple the company but be unfair. If Jose was to benefit from PPNV's profits, Jackson argued, "then he should be liable for any taxes the company may have to incur," but "he's getting all the gain and Tracy is getting zero." Furthermore, Jackson complained, "we have been the ones that have been providing all the documents . . . and the depositions," and Jose was unjustifiably being held harmless without any inquiry into his independent assets.

Perkovich's October 28 ruling states that Jackson reported on the morning of the October 9 hearing that Tracy could not appear because she was ill, "there were potential tax issues which may implicate her rights against self-incrimination [that] may give rise to the assertion of her 5th Amendment privilege" and her named expert, Kevin Ziegler would not attend "due to 5th Amendment issues." Perkovich denied Jackson's request to continue the hearing to permit an arrangement in which Tracy and Ziegler would be able to testify, but received the testimony of Jose's expert Darlene Elmore and also considered the deposition testimony of Tracy and Ziegler, as well as documentary evidence presented by the parties.

Perkovich found that Tracy authorized payment from PPNV of $273,004.15 for legal fees she paid four attorneys, that under a prior court order Jose was entitled to 40 percent of this amount, $109, 201.66, in order to pay his own attorneys, and ordered that amount paid to Jose in the form of spousal support, together with simple interest of 10 percent commencing

9

on the date each distribution was made. The October 28 ruling also directed that, with respect to the arrearages in spousal support, "[a] writ of execution shall issue forthwith." The ruling stated that there was evidence Tracy had improperly taken other corporate distributions for her personal benefit, and Perkovich reserved jurisdiction to make further orders about them and any other challenged distributions until the necessary business records were made available to Jose.

On November 7, 2013, Jose filed a request in the superior court "For Control and Management of [PPNV] or in the Alternative for Appointment of a Receiver." Jose claimed Tracy failed to pay him monthly spousal support in violation of the June 2011 support order, "directed [PPNV] to withhold her salary and is refraining from taking a paycheck so that her pay will not be subject to a Wage Garnishment Order reactivated by Jose on June 18, 2013," and authorized PPNV to pay various personal expenses on her behalf, thereby reducing the company's net income and profitability to Jose's detriment. He also claimed she was not involved in the daily operations of the company and was engaging in "erratic conduct demonstrat[ing] a renewed instability and inability to manage the community business." According to Jose, "Tracy's continued control of the company's operations virtually assures she will be able to thwart the court's rulings and deprive Jose of funds for support and fees." Jose asked the court to (1) award him "exclusive management" of PPNV and order him to (2) remove Tracy from her position as CEO of PPNV, (3) "immediately suspend" her annual salary of $350,000, (4) direct PPNV to pay him an annual salary not to exceed $350,000, and authorize him to make distributions from PPNV "to pay spousal support arrearages, attorney's fees, expert costs, and any outstanding Judge *Pro Tem* fees." In the alternative, Jose asked the court to appoint a named receiver to run the company.

### *Settlement Efforts and Tracy's Claim of Duress*

According to Blevan's declaration, the parties had begun settlement negotiations at conferences in October 2012, and June 2013, the latter a few months after Jackson substituted into the case. Tracy extended two proposals in July 2013, and in August 2013, Jose proposed a "complete and global resolution" that Blevans later described as having become the "foundation" for the Memorandum of Agreement (MOA) the parties eventually signed. In

10

November, after Jose filed his request to gain control of PPNV, Tracy offered another settlement proposal. According to Blevans, Tracy, Jackson, and Tracy's attorneys Ian Carter and Eric Jeppson all attended an all-day settlement conference on December 4, 2013, though Tracy "was asked to leave . . . due to her disruptive behavior" and discussions continued at a December 23 meeting attended by Jackson, Carter, and Jeppson. Blevans then met with Jeppson and Carter on January 10, 2014, to discuss how Tracy would structure payments Jose had agreed to accept at the December 23 meeting. At this point, the hearing on Jose's motion for control of the company or appointment of a receiver was set for January 14, 2014.

The agreement Tracy signed on January 13, 2014, required her to pay Jose $300,000 for the parties' residence, $2,400,000 to equalize the division of property other than the residence, and spousal support of $25,000 per month, nonmodifiable until the equalizing payment was made in full. Tracy's spousal support obligation was to "survive" Jose's remarriage and continue until his death.

According to Tracy and Jackson, the MOA was negotiated without their participation at the January 10, 2014, meeting between Blevans, Jeppson and Carter. Jeppson and Carter worked for Tracy on corporate and tax matters involving PPNV; she stated in a declaration that they "negotiated without my authorization." Jackson stated that upon his arrival at Blevans's office on January 10, he was met by Jeppson and Carter, who informed him that Blevans "was unavailable because he was attending to another matter," and that an agreement had been reached "resolving all material issues before the court."

As described in her brief and declaration in support of the present writ petition, Tracy considered the MOA "disastrous." Tracy stated in her declaration that she only received the document late on the afternoon of the day before the hearing on Jose's motion to take control of PPNV or put the company in the hands of a receiver, and she "did not understand the terms of the Agreement." Tracy claims she was "emotional, confused, and afraid" at being forced to decide either to sign the MOA or submit to a hearing before a judge she considered biased against her on a motion seeking to transfer control of PPNV to Jose. Tracy would not have executed the MOA, she said, "except for the threats against my company"; she "feared for her company's existence, her employees' futures, and her own livelihood [and] was also

11

concerned about possible tax and criminal ramifications due to Jose's refusal to share information about off-shore bank and brokerage accounts he had established with company money, leaving Tracy to face the consequences here, while he stayed in Argentina." Assertedly on the basis of Jackson's prediction that Perkovich would likely grant Jose's motion to grant him control of PPNV or appoint a receiver, Tracy signed the MOA, but noted on the document that she did so "under protest." On January 14, 2014, after Jackson told her the MOA would not be accepted with that notation, Tracy signed a fresh copy without expressing protest. Jackson confirmed that, based on his assessment of the situation, he advised Tracy the document would not be accepted if she wrote on it that she signed "under protest," and her only options were: "(a) execute an identical copy of the Agreement without the words 'under protest' on the document (thereby avoiding the receivership hearing), or (b) proceed with the receivership hearing on the following day."[13]

***Tracy Obtains Disqualification of Perkovich***

On March 26, 2014, Jackson was substituted out of the case and Tracy's present lawyers, Keith E. Dolnick and David B. Ezra, entered the fray. Two months later, on May 20, 2014, Jose filed a motion to enforce the MOA pursuant to section 664.6. Tracy's new lawyers, who had not yet learned of the mutual private judging relationship between Blevans and Perkovich, opposed the motion on the grounds that (1) the parties had not, prior to signing the MOA, served on one another or mutually waived the final declarations of

---

[13] At his deposition in March 2015, Jeppson stated that he was retained by PPNV and HEI, not Tracy individually, and was focused on "trying to make sure the company had the wherewithal to meet different proposed schedules of payments [to Jose]." When asked whether Tracy's statement that the MOA "was negotiated without my authorization by my two corporate attorneys Eric Jeppson and Ian Carter" was true, Jeppson replied "I don't know, I can't tell you what was in her mind about what she said about what she believed . . . but I can tell you I would not have negotiated without the authorization of the entities." During the January 10 meeting, Jeppson periodically kept Jackson "posted" on developments, and Jeppson believed Jackson understood himself to be on "standby" in case he was needed. Jeppson concluded that PPNV could "cash flow the payments" to Jose. After the meeting, in a conference call, Jackson explained to her the terms of the "final version" of the agreement counsel came up with.

12

economic interests and income and expense as required by Family Code section 2105, and (2) Tracy signed the MOA under economic duress.

On May 30, 2014, Tracy filed a second motion to withdraw the stipulation and order appointing Perkovich temporary judge, this time on the ground that, due to Perkovich's failure to certify that she was "aware of and will comply with applicable provisions of canon 6 of the Code of Judicial Ethics and the Rules of Court," as required by rule 2.831(b), she lacked the power to rule on the pending motion to enforce the MOA pursuant to section 664.6, and lacked judicial authority "to make any of the determinations she has made in this matter to date." The motion maintained that Perkovich's failure to provide the certification required by the Rules of Court provided "good cause" permitting Tracy to withdraw the stipulation (rule 2.831(f)). Tracy also contended that the stipulation and order did not grant Perkovich authority to decide a motion under section 664.6, which was outside the scope of the cause she was hired to judge. The motion was denied on July 11, 2014. Tracy filed a writ petition in this court challenging the ruling, which we denied on September 10.

On September 22, 2014, Tracy's present counsel requested from Perkovich a copy of the "engagement letter and any disclosures signed by [Tracy] that were made by Perkovich," as well as copies of billing statements in the case and a list of "any articles co-authored by Perkovich and Blevans over the past four years and any seminars they had spoken at together." Perkovich responded by e-mail as follows: "I gave a verbal disclosure of the personal and professional contacts I have had with Mr. Munsill and Mr. Blevans at our first meeting on October 29, 2012.[14] All parties, their attorneys, and their forensic CPAs were present. I disclosed the professional committees I was on with Mr. Munsill and the professional organizations I had in common with both attorneys and the limited social contact I had with each attorney. I disclosed that I had hired both Mr. Munsill and Mr. Blevans to act as judge pro tems. or settlement judges on cases I had and that I had also been hired by each of them previously in the capacity of settlement judge or judge pro tem."

---

[14] The pleadings of the parties state that the first meeting was on October 30, 2012, not on October 29, as Perkovich states. The discrepancy is inconsequential.

13

On October 7, 2014, Tracy asked the presiding judge of the Napa County Superior Court to disqualify Perkovich.[15]  Tracy's "statement of disqualification" was  based on two separate grounds.  The first was that "Perkovich violated the Canons of Judicial Ethics by disclosing her mutual judging relationship, if at all, only verbally and off the record,"  and "there is no written waiver."  Tracy's motion asserted that "[i]t was not until September of 2014 that I first learned that Perkovich uses Blevans as a private judge in cases where she acts as an attorney representing a client in a divorce case (and he returns the favor by using Perkovich as a private judge in cases where Blevans is representing a client in divorce proceedings.)  According to Tracy, "Perkovich first disclosed that information in an informal e-mail dated September 22, 2014."

The second ground for disqualification alleged in Tracy's motion was that any person aware of her conduct "would have substantial doubt that Perkovich was or could be impartial," and Perkovich should therefore be disqualified under section 170.1, subdivision (a)(6)(A)(iii).  In support of her bias claim, Tracy declared that Perkovich "seemed to visibly favor" Jose and Blevans and "took steps to block" Tracy's attorney from introducing evidence supporting her contentions.  Perkovich allegedly refused to order Jose to produce bank statements that Tracy claimed would show he was improperly withholding community property for himself; unfairly imposed a levy on the bank account from which Tracy directed

---

[15] The request was filed on a Judicial Council form "Request for Order" and characterized as a "Motion to Disqualify Nancy Perkovich."  As noted in *Urias v. Harris Farms, Inc*. (1991) 234 Cal.App.3d 415 (*Urias*), technically, disqualification is sought in the form of a "statement of disqualification," which is not a motion.  (*Id*. at p. 422.)  As *Urias* explains, section 170.3, subdivision (c) (1), provides that if a judge who should disqualify himself or herself fails to do so, "any party may file with the clerk a written verified statement objecting to the hearing or trial before the judge and setting forth the facts constituting the grounds for disqualification of the judge."  As far as we are aware, neither Perkovich nor Jose objected to the form in which Tracy sought disqualification, and Judge Stone treated the motion as a statement of disqualification.  While the statement of disqualification was not verified as required by section 170.3, subdivision (c)(1), it was in the form of a declaration under penalty of perjury, which is sufficient.  (*Urias*, at p. 421, fn. 4, citing *Hollingsworth v. Superior Court* (1987) 191 Cal.App.3d 22, 25-26.)

payment of spousal support despite knowing the account "had been swept to pay Mr. Blevans $185,000 in attorney fees" and Tracy had no other personal funds; and conducted hearings unfairly, for example by giving no notice she would refuse to receive oral testimony at the July 30, 2013, where she knew Tracy planned to present witnesses. Tracy declared that Perkovich conveyed bias by her "body language and her tone toward me and Mr. Jackson," which "was very different than it was toward Mr. Blevans and [Jose]. She was very standoffish, and regularly appeared to be visibly and noticeably annoyed with me" and "often would stand over me with her arms crossed. She would never make eye contact with me. When [Jose] or Blevans spoke, Perkovich was relaxed and thoughtful, often making helpful comments or asking insightful questions that would help them fully develop the point they were trying to make." Perkovich also allegedly engaged in "highly inappropriate" interactions with Blevans. "For example," Tracy stated, "during the July 30, 2013, hearing, I personally saw Perkovich flirt with Blevans, proclaiming, 'Oh Bob, that's so funny of you,' while she batted her eyelashes at him," and Perkovich and Blevans "inappropriately spoke to each other about the case when my attorney was not present," which Tracy assertedly learned from an invoice billing her for the time Perkovich spent on the phone, without Tracy's lawyer, in preparation for a hearing.

Jackson's declaration in support of Tracy's motion to disqualify corroborated Tracy's description of Perkovich's different demeanor with Tracy and Jackson than with Jose and Blevans. Jackson noted that Perkovich and Blevans "were on a first name basis" and "knew things about each other that were not generally known to the public," such as when Blevans congratulated Perkovich on the birth of her grandchild. Blevans had Perkovich's " 'after hours number,' " which Jackson never had, and appeared to have discussed the case with her outside Jackson's presence. During the proceedings, Perkovich "demonstrated a strong affinity toward Blevans" through "tone of voice, body language, eye contact and other physical means," such as rolling her eyes at Jackson and then "making knowing eye contact with Blevans" and "shaking her head from side to side." Perkovich's "body language and voicetone toward [Tracy] was almost always very negative, indicating dismissiveness, condescension, and superiority," while she "always

15

appeared understanding and accommodating toward Osuch and Blevans." Her "tone, body language, and actions led everyone involved to believe that [Tracy] was not going to prevail on any significant issue that might be decided by Perkovich." Jackson believed Perkovich was aware that her actions were presenting the appearance that she was favoring Blevans and Jose, as indicated by her comment at a hearing that she could see from Tracy's pleadings and demeanor that Tracy did not trust Perkovich to judge the case fairly.

Additionally, the declaration of Tracy's current counsel, Keith Dolnick, related an incident in which he believed Perkovich acted in a manner that appeared to favor Jose. After Tracy filed her motion to withdraw the stipulation appointing the temporary judge based on Perkovich's failure to provide the certification required by rule 2.831(b), Jose's attorneys sent Perkovich two certifications to sign, one stating that she was aware of and would comply with the applicable provisions and the other adding that the certification was "further evidenced by" Perkovich's "Consent and Oath of Office" in another case, which was attached as an exhibit. Dolnick declared that he objected to this " 'improper ex parte communication without prior notice' " and asked Perkovich to take no action and remain neutral, to which Blevans responded by telling Perkovich that signing the certification was appropriate " 'and if it moots the issue raised by Mr. Dolnick, so be it.' " Perkovich signed the second certification. Dolnick further described Blevans communicating ex parte with Perkovich after Tracy filed a motion to quash, emailing her to ask " 'how she would like to handle this issue."

On October 16, 2014, before any hearing or ruling on the request to disqualify, Perkovich delivered to the Presiding Judge of the Napa County Superior Court a letter expressing a desire to recuse herself from the case. Noting that Tracy had filed a motion to disqualify her "on the grounds of bias," the letter asserts that Tracy "claims a bias in favor of Blevans because Blevans has acted as a private settlement judge on one case where I was associated as counsel and because I have been hired on two cases where he was an attorney." Pointing out that she also "had the same mutual judging relationship with two of [Tracy's] previous attorneys, Roger Lewis and John Munsill," Perkovich disagreed that her prior professional relationship with Blevans constituted bias and stated that Tracy

16

consented to her retention as temporary judge "after disclosure from me at our first case management meeting about the details of my professional relationship with both Munsill and Blevans." Perkovich's letter to Presiding Judge Stone then ended with the following paragraph:

"I have, however, become concerned about my personal safety in this case due to [Tracy's] conduct. Her behavior has become increasingly hostile with angry outbursts to the point that I am fearful of her. It is also evident from [Tracy's] ongoing violations of the existing court orders that she will never accept anything I decide. I therefore feel that I am an impediment to resolution of the parties' case, which is not desirable. It is for these reasons that I request recusal."

In an order filed on November 7, 2014, Presiding Judge Stone granted Tracy's request to disqualify Perkovich. The order found that Perkovich's letter requesting recusal "does not satisfy the requirement of the filing of consent to the disqualification" imposed by section 170.3, subdivision (c)(3),[16] and that "as a result of her failure to file a consent or a verified answer within the time allowed, Nancy Perkovich is deemed to have consented to her disqualification pursuant to Code of Civil Procedure section 170.3[, subdivision] (c)(4)." [17] The order declared, "Nancy Perkovich is hereby disqualified as Judge Pro Tempore in this action and shall not participate in the proceedings in this action after October 7, 2014," the

---

[16] Section 170.3, subdivision (c)(3), provides: "Within 10 days after the filing or service, whichever is later, the judge may file a consent to disqualification in which case the judge shall notify the presiding judge or the person authorized to appoint a replacement of his or her recusal as provided in subdivision (a), or the judge may file a written verified answer admitting or denying any or all of the allegations contained in the party's statement and setting forth any additional facts material or relevant to the question of disqualification. The clerk shall forthwith transmit a copy of the judge's answer to each party or his or her attorney who has appeared in the action."

[17] As will be discussed *post*, the order as prepared by Blevans also stated, "Petitioner Tracy Hayward's Request for Order re Motion for Disqualification, filed October 7, 2014, is rendered moot." The court amended this language by interlineation to read, "The court is making no finding as to whether the allegations set forth in Petitioner Tracy Hayward's Request for Order re Motion for Disqualification, filed October 7, 2014, is true."

17

date Tracy filed her request for disqualification. The order reassigned the case to Superior Court Judge Diane M. Price.

### The Case Proceeds Before Judge Price

On December 10, 2014, Judge Price conducted a hearing on Jose's motions to reopen discovery and compel the production of documents and Tracy's motions to quash subpoenas compelling her and Jackson to submit to deposition, all of which related to Jose's earlier motion to enforce the MOA, which had been submitted to Perkovich but not decided before she was found disqualified. At the hearing before Judge Price, Tracy objected to reopening discovery on matters related to whether she signed the MOA under duress primarily because much of the evidence Jose sought to discover regarding that matter was protected by the attorney client and/or work product privilege. Rejecting this objection on the ground Tracy's and Jackson's declarations constituted a waiver of privilege as to certain communications between her and her attorney, Judge Price reopened discovery related to Jose's pending motion to enforce the MOA and requests pertaining to attorney fees and spousal support. Judge Price felt it would be "fundamentally unfair" to allow Tracy to file declarations discussing her communications with Jackson without allowing discovery by Jose limited to those communications between Tracy and Jackson she relied upon in the declaration she filed in opposition to Jose's motion to enforce the MOA. Tracy withdrew her objections to the production of documents pertinent to a range of issues that did not implicate the attorney-client and/or work product privileges. Judge Price continued for further hearing Tracy's motion to quash a subpoena to Jackson and ordered him to submit all responsive documents for the court's in camera review to determine which were to be produced and whether redaction was required for any attorney-client privilege and/or work product information that had not been waived. Tracy's motion to quash a subpoena to her was denied.

On January 28, 2015,[18] Tracy asked Judge Price to declare void and vacate all orders issued by Perkovich, arguing that the orders of a disqualified judge are void and the disqualification occurs when the facts creating disqualification arise, not when the

---

[18] All further dates will refer to 2015 unless otherwise specified.

disqualification is established.[19]  Judge Price subsequently filed an order granting Jose's motion to continue the hearing on Tracy's motion, because Tracy had not filed a declaration supporting the relief sought, and the scheduled depositions of Tracy and Jackson might "cover the issues raised" in the motion.  Judge Price's March 2 order also denied Jose's motion to consolidate the hearings on Tracy's motion to set aside Perkovich's orders and Jose's motion to enforce the MOA because the motions "involve discrete issues."

Meanwhile, at a hearing on February 3, Judge Price granted Jose's request for appointment of a discovery referee (§ 639, subd. (a)(5)) to attend the depositions of Tracy and Jackson.[20]  Accepting Jose's arguments, Judge Price granted the request on the basis of three "exceptional circumstances":  (1) Tracy's behavior at the previous deposition was "extraordinarily rude, nonresponsive, [and] argumentative," (2) the attorney-client privilege would probably be raised by Tracy and Jackson and it would be "expeditious" to have rulings on those objections during the deposition, and (3) Tracy was "reluctant" to turn over financial information legally required to be disclosed, and it would be helpful to have a referee present to "monitor."

Also at the February 3 hearing, Judge Price addressed Jose's earlier motion to award him the reasonable expenses, including reasonable attorney fees, he incurred in prevailing on his motions to reopen discovery, produce documents, and subpoena Tracy and Jackson for appearances at depositions.  Finding that Tracy's opposition to all of Jose's discovery requests was without "substantial justification" (§§ 2024.050, subd. (c), 1987.2, subd. (a))— because it was unreasonable to think she could maintain she did not understand the MOA she signed and was relying on the statements or failures to act of her attorney "and not think that opens the door to discovery"—Judge Price awarded Jose the total amount of $36,091.

On March 10, Tracy filed a five-page declaration in support of her motion to vacate Perkovich's orders.  Tracy explained that if Perkovich verbally disclosed her professional

---

[19] Petitioner cited, inter alia, *Christie v. City of El Centro* (2006) 135 Cal.App.4th 767 (*Christie*) and *Rossco Holdings, Inc. v. Bank of America* (2007) 149 Cal.App.4th 1353, 1363 (*Rossco Holdings*), which we later discuss in detail.

[20] The court's order was filed on February 20.

relationship with Blevans at the settlement conference on October 30, 2012—which was almost seven months after Perkovich was appointed temporary judge - Tracy was unaware of it because "I was either not involved in those discussions or did not believe they were directed at me. Nor did I understand an informal discussion or exchange of pleasantries could later be used to argue that it had forced me to waive valuable rights, including the right to a neutral, unconflicted judge." Tracy's declaration reiterated that she did not learn of Perkovich's mutual judging arrangement with Blevans until the September 2014 email. She also reiterated the concerns stated in her declaration in support of her motion to disqualify Perkovich about the manner in which Perkovich conducted hearings and, in Tracy's view, her demonstrated bias in favor of Jose and Blevans. Tracy further stated that she had not had any contact with Perkovich since the December 2013 settlement conference, and that she did not recall having any "meaningful interaction" or exchanging any words with Perkovich at the conference, during which Tracy "spent the large majority of time . . . sitting in my car or in the lobby of Blevans office."

### Perkovich Resists Tracy's Demand for Refund of Fees

On March 27, after Tracy demanded repayment of all fees paid Perkovich pursuant to the terms of the 2012 Stipulation and Order, Perkovich filed a request for declaratory relief. Asking for "direction . . . as to how she should respond to the demand that she refund all fees and costs paid by [Tracy] pursuant to the Stipulation and Order, Perkovich stated that she had performed all of the services she was called upon to perform and was entitled to be compensated for that work in accordance with the terms of the Stipulation and Order.[21] She also pointed out that the superior court had twice (October 10, 2013 and July 11, 2014) denied Tracy's requests to withdraw the Stipulation and Order appointing her temporary judge; the second of these rulings found the Stipulation and Order was "valid and

---

[21] As material, the Stipulation and Order stated that Tracy "shall advance all fees of Perkovich, who bills at the hourly rate of $450.00, subject to later allocation by the court." Perkovich stated in her request for declaratory relief that "her total fees and costs charged from October 30, 2012, to November 19, 2014, are $42,064.09, Tracy has paid $37,625.09 and $4,439.00 remains outstanding.

20

enforceable" and, by voluntarily participating in proceedings before Perkovich, Tracy waived "any objection to the Stipulation and Order."

Perkovich represented that she told the six persons present at the October 2012 settlement conference—Tracy and Jose and their counsel, as well as David Schultze and Darlene Elmore, forensic accountants for the parties— "about my professional contacts with each attorney including the fact that (1) I had been hired once before as a judge pro tem in a case where Blevans was an attorney, (2) Blevans was hired as a judge pro tem once in a case where I was an attorney, (3) Munsill was hired as a judge pro tem once in a case where I was an attorney, (4) I was hired as a settlement judge once in a case where Munsill was an attorney, (5) Munsill and I had been previously associated as counsel on a case, (6) I served on the Sacramento Family Law Bar Association Committee with John Munsill and socialized once with he and his wife and children related to that professional organization, and (7) I am a member of the American Academy of Matrimonial Lawyers and was acquainted with Blevans from that organization. I also disclosed that I had hired David Schultze, CPA many times on cases throughout my career and had also had him as an opposing expert on many cases. I had not previously met Darlene Elmore, CPA. I asked all parties and attorneys if they were comfortable with my acting as judge pro tem. All parties indicated that they wished me to proceed in that capacity."

Blevans, Elmore, and Schultze all stated in declarations or deposition testimony given in late 2014 or early 2015 that Perkovich verbally disclosed her prior contacts with Blevans and with Munsill at the October 2012 meeting, including that she and each of the attorneys had acted as temporary judge in each others' cases, and that the parties agreed to proceed with Perkovich as temporary judge.

Munsill testified at a deposition in February 2015 that he recalled Perkovich discussing at the settlement conference "her various prior connections with both [Blevans] and me," but did not recall "the details" of that discussion. He did not recall Tracy expressing concerns about Perkovich's disclosures. Munsill acknowledged that he had a "mutual judging relationship with Perkovich," each having served as judge in a case where the other represented a party. Munsill stated that he had no reason to believe inaccurate the

21

statement in Blevan's declaration that after Perkovich's disclosures at the settlement conference, "both counsel and the parties acknowledged their understanding and agreement to move forward with Judge Pro Tem Perkovich presiding." He did not recall presenting Tracy with a written waiver of any potential conflict after Perkovich disclosed her professional relationships with the two attorneys and stated, "I don't recall there being a need for that."

***Judge Price Expands Discovery***

On April 13, over Tracy's objections, Judge Price granted Jose's motion to clarify her earlier ruling that Tracy waived her attorney-client privilege regarding matters Jose sought to discover. Judge Price clarified that Tracy's waiver of the attorney-client privilege included "any communications with or between attorneys Trevor Jackson, Ian Carter, and or Eric Jeppson made from the time period beginning August 9, 2013 (when the parties began active settlement negotiations that lead to the Memorandum of Agreement) to [the] present" regarding the claims that (1) Tracy "was not part of the negotiations that took place regarding the Memorandum of Agreement" and "had no input whatsoever"; (2) Eric Jeppson and Ian Carter were not authorized to negotiate the MOA on Tracy's behalf; (3) Tracy was unclear how the terms of the MOA were reached; (4) Tracy did not understand the terms of the MOA; and (5) Tracy was "forced" to execute the MOA due to a threat that her company would be taken away from her.

Also over Tracy's objections, Judge Price expanded the time period of the documents relating to negotiation of the MOA that Jackson was required to provide for in camera review in response to Jose's subpoena duces tecum. In addition to the documents he prepared and gave Tracy between January 10 and January 13, 2014, Jackson was also required to produce those he prepared and provided Tracy during the period from August 9, 2013, to the present. Finally, the April 13 order found that Tracy's opposition to the foregoing discovery was "not reasonable" in light of the court's prior ruling that Tracy waived the attorney-client privilege, and granted Jose's request for attorney fees and costs under section 1987.2, subdivision (a), in the amount of $6,000.

22

*We Issue an Order Staying all Trial Court Proceedings*

On April 16, 2015, we issued an order temporarily staying "all discovery proceedings," including the pending depositions of Tracy and Jackson.

A little more than three weeks later, on May 21, 2015, Jose submitted to the trial court (which stamped the document "Received") a Memorandum of Points and Authorities and declaration of Blevans in support of Perkovich's right to refuse to refund the fees paid her by Tracy. Blevans stated in his declaration that the Stipulation and Order appointing Perkovich a temporary judge was drafted by Munsill, who did not "include any provision authorizing any judge of the Superior Court to make any determination concerning the reasonableness of her fees or to order any refund of fees and costs that were advanced." Jose argued that Tracy's demand for a refund of fees she paid could not be granted because such relief was not authorized by the Stipulation and Order under which the fees were paid and because Perkovich was protected by a common law quasi-judicial immunity. The latter contention was based upon *Howard v. Drapkin* (1990) 222 Cal.App.3d 843, which was a civil action seeking damages for professional negligence against a psychologist evaluating a child custody dispute.

Tracy had responded to Perkovich's request for declaratory relief in a brief dated May 18 that, at least in the record before us, does not bear any stamp from the trial court. Relying on cases, such as *A.I. Credit Corp., Inc. v. Aguilar & Sebastinelli* (2003) 113 Cal.App.4th 1072 (*Aguilar*), holding as a matter of law that "an attorney disqualified for violating an ethical obligation is not entitled to fees" (*id.* at p. 1079), Tracy argued a private judge disqualified for violation of an ethical obligation should not be treated differently.[22] Tracy emphasized that Perkovich's request ignored the crucial fact that all of the orders she was paid by the parties to make were void and had to be vacated, and that the Stipulation and

___

[22] Tracy also maintained that one who, like Perkovich, is "not a party to the [proceeding] may not make a motion" (*Chase v. Superior Court* (1962) 210 Cal.App.2d 872, 876), and her request for declaratory relief could therefore be made only through a separate lawsuit, citing section 1060, "Any person interested . . . may . . . bring an original action or cross-complaint in the superior court for a declaration of his or her rights and duties . . . ." Tracy's writ petition does not include this claim.

23

Order had no bearing on Perkovich's rights after she was disqualified for violating ethical obligations.

At the time we issued our stay, Judge Price had issued no ruling on Perkovich's request for declaratory fees regarding her entitlement to the fees Tracy had advanced.

On June 2, a week after Jose filed his support for Perkovich's request for declaratory relief, Tracy asked this court to expand the scope of the temporary stay of discovery we issued on April 16 because, since issuance of that stay, Perkovich had been aggressively pursuing her motion for declaratory relief, Jose had asked Judge Price to direct Tracy to advance him $250,000 for attorney fees he might incur in this and related efforts, and a hearing on many of Jose's requests had been set for June 1, 2015. Tracy represented that her attorneys "have been required to prepare multiple opposition/responses and participate in multiple hearings in response to the flurry of paperwork initiated by [Jose] and Perkovich" and that counsel for Jose refused to stipulate to a stay of litigation in the trial court pending action on this writ petition. Tracy maintained that the discovery issues Jose and the trial court were preoccupied with should have been put on hold pending a determination whether the rulings of a disqualified judge are void and must be vacated, because that determination would facilitate a resolution of most other issues presented, including Perkovich's right to receive fees for services rendered in violation of her ethical obligations.

On June 3, we expanded the earlier stay by additionally staying "all trial court proceedings" pending determination of this writ petition or further order of the court.

## DISCUSSION

The fundamental question presented is whether the rulings of disqualified "Temporary Judge Perkovich" are void and must be set aside. If so, additional questions are whether Perkovich must refund fees she received for her services and whether the disqualifying acts of the temporary judge so tainted the MOA that it must be deemed unenforceable, and so tainted the proceedings before Judge Price that her rulings must also be vacated.

24

# I.

### *Disqualified Temporary Judge Perkovich's*
### *Orders Are All Void and Must Be Vacated*

Under section 170.1, "(a) A judge shall be disqualified if any one or more of the following are true:  [¶] . . . [¶] (6)(A) For any reason:  [¶] . . . [¶] (iii) A person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial."

As we have said, Tracy's motion to disqualify was based on Perkovich's alleged violation of canon 6D by failing to disclose her personal or professional relationships with Blevans "in writing or on the record" and failure to obtain the parties' written waiver to disqualification on that ground and file it with the record as required by section 170.3, subdivision (b)(1).  The motion to disqualify was also based upon the claim that Perkovich's conduct during the proceedings over which she presided demonstrated that she was actually biased and prejudiced against Tracy.  Tracy maintains that a person aware of the facts Perkovich declined to disclose in writing or on the record, and/or her biased conduct during the proceedings, "might reasonably entertain a doubt that [Perkovich] would be able to be impartial."  (Canon 6D(3)(a)(vii)(C), § 170.1, subd. (a)(6)(A)(iii).)

The statutory scheme governing the disqualification process, presents three options to a judge whose impartiality has been challenged by the filing of a statement of disqualification.  First, the judge may, "[w]ithout conceding his or her disqualification, . . . request any other judge agreed upon by the parties to sit and act in his or her place."[23] (§ 170.3, subd. (c)(2).)  The second option is to timely "file a consent to disqualification in which case the judge shall notify the presiding judge . . . of his or her recusal" and the presiding judge appoints a replacement.  (§ 170.3, subd. (c)(3).)  The third option is to "file a written verified answer admitting or denying any or all of the allegations contained in the party's statement and setting forth any additional facts material or relevant to the question of disqualification." (*Ibid*.)    Presiding Judge Stone held that Perkovich's October 16, 2014, letter requesting recusal (for reasons independent of Tracy's allegations in her statement of

---

[23]  If the parties cannot agree on a replacement judge, such a judge is selected by the chairperson of the Judicial Council.  (§ 170.3, subd. (c)(5).)

disqualification) did not constitute a consent to disqualification within the meaning of section 170.1, subdivision (c)(3).[24] Judge Stone therefore applied section 170.3, subdivision (c)(4), which provides that where a challenged judge fails to timely file either a consent or an answer to the statement of disqualification, he or she "shall be deemed to have consented to his or her disqualification." (§ 170.3, subd. (c)(4)).)

The meaning of this determination is disputed by the parties: In Tracy's view, "consent" and "deemed consent" to disqualification" are equivalent to admitting the facts alleged in the statement of disqualification. Jose sees it differently, viewing "consent to disqualification" as consent to being removed from the case *without admission of the truth of the alleged basis for disqualification*. Jose's view misinterprets the statutory scheme. As indicated, the option section 170.3 provides for a challenged judge who wishes to consent to disqualification "[w]ithout conceding" there is a factual basis for disqualification is to "request any other judge agreed upon by the parties to sit and act in his or her place." (§ 170.3, subd. (c )(2).) Perkovich elected not to pursue that course. Nor did she file a response to the motion to disqualify her. Instead, informally, by letter to Judge Stone, she denied Tracy's allegations and sought recusal on different grounds. Because she elected not to either seek replacement or file a consent or an answer contesting Tracy's allegations as provided in section 170.3, Perkovich was properly "deemed to have consented" to her disqualification. That determination treats the judge's failure to file a response to the statement of disqualification as an admission of the truth of its allegations, and authorizes the presiding judge to appoint a replacement.

It is settled that, as stated in *Urias v. Harris Farms, Inc., supra*, 234 Cal.App.3d 415, "[w]hen no answer is filed in response to a statement of disqualification, *the facts set out in*

---

[24] Aside from the fact that Perkovich's letter was not "filed" with the court as required for a consent under section 170.3, subdivision (c)(3), it could not be viewed as a "consent to disqualification" because it disavowed the allegations of the statement of disqualification. Nor could it be viewed as an "answer" within the meaning of the statute because it was not verified and filed. Instead of following the statutory procedure, Perkovich attempted to circumvent the disqualification motion by seeking recusal based on her professed fear of Tracy, a basis wholly independent of the motion for disqualification.

26

*the statement* are taken as true." (*Id.* at p. 424, italics added.) In support of that proposition, the *Urias* court cited the statement in *Oak Grove School Dist. v. City Title Ins. Co.* (1963) 217 Cal.App.2d 678 (*Oak Grove*) that where the "statement of disqualification" of the party seeking disqualification "is legally sufficient and the judge fails to file an answer thereto within five days,[25] the facts alleged in the statement must be taken as true and the judge becomes disqualified automatically." (*Id.* at p. 702.) The California Supreme Court was equally clear in *Calhoun v. Superior Court* (1958) 51 Cal.2d 257, 262: After identifying the two factual issues raised by the statement of disqualification, the court concluded, "since the judge has failed to file a written answer to the statement of bias and prejudice, verified as required by section 170 of the Code of Civil Procedure, the facts alleged in the statement must be taken as true."

The opinion in *Oak Grove* stated that that the failure of a challenged judge to file a verified answer within the specified period "has the same effect as if the judge admits his disqualification or is found disqualified." (*Oak Grove, supra,* 217 Cal.App.2d at p. 702.) As *Urias, supra*, 234 Cal.App.3d 415 explained, a challenged judge "cannot simply ignore [a statement of disqualification]. If the judge does not strike the statement [as untimely or legally insufficient on its face] and wants to contest his disqualification, he must file an answer within section 170.3, subdivision (c)(3)'s 10-day period admitting or denying the allegations in the statement. If he fails to do so, he is deemed to have consented to the disqualification and he is disqualified." (*Urias*, at p. 421.) In short, *Urias*, *Oak Grove*, and the cases they rely upon stand for the proposition that the facts alleged in a statement of disqualification must be considered true where, as here, the judge whose impartiality was challenged fails to consent to or challenge the allegations of the statement of disqualification.

Repeatedly dismissing *Urias* and *Oak Grove* as "lacking substantive analysis" and "without analytical support" Jose claims they are also distinguishable, because "the facts establishing disqualification in [those cases] were underlined undisputed, making the only relevant issue

---

[25] The time period within which the judge was required to answer at the time *Oak Grove* was decided, 5 days, has been extended to 10 days. (§ 170.3, subd. (c)(3).)

the legal sufficiency of the statement of disqualification." According to Jose, unlike the situations in *Urias* and *Oak Grove,* the facts alleged in Tracy's statement of disqualification *are* disputed. Moreover, Jose argues, because Perkovich declined to answer the statement of disqualification, he was left "with no alternative but to stipulate to her disqualification with the caveat that he did not agree that Perkovich is subject to disqualification for the reasons stated in Tracy's motion." In other words, Jose asserts that Perkovich's failure to dispute the allegations of Tracy's statement of disqualification cannot deprive him of the right to contest the truth of those allegations. He states, "[b]efore any fact is determined to be true and used to adversely affect a party, that party must be given the opportunity to be heard concerning whether or not those facts are true."

The dispute Jose perceives and desires to engage in is whether the unanswered allegations of Tracy's statement of disqualification are factually true. But he offers no authority for the proposition that a party has a right to dispute grounds for disqualification alleged by another party which the challenged judge does not contest. The only instance in which the statutory scheme appears to allow a party to participate in a disqualification dispute is when the challenged judge files an answer denying any or all of the allegations contained in a statement of disqualification, and the judge deciding the question of disqualification sets the matter for hearing or receives evidence in some other fashion. (§ 170.3, subd. (c)(6).)

If, as Jose maintains, a judge who files neither a consent nor an answer to the statement of disqualification filed by a party does not dispositively concede the truth of the facts alleged in the statement, a challenged judge's failure to respond to a motion to disqualify would be relatively inconsequential and render purposeless subdivision (c)(2), which expressly permits a challenged judge to secure a replacement without conceding disqualification. The statutory scheme places the decision whether to contest the factual basis of a statement of disqualification solely in the hands of the challenged judge. Jose fails to appreciate that, as *Urias* explained and we previously noted (see fn. 15, *ante*, at p. 14), a request for disqualification is not genuinely a "motion" but in the nature of a charging document: a "written verified statement objecting to the hearing or trial before the judge and

28

setting forth the facts constituting the grounds for disqualification of the judge." (§ 170.3, subd. (c)(1).) "[T]he determination of a judge's disqualification is outside the usual law and motion procedural rules." (*Urias, supra*, 234 Cal.App.3d at p. 422.) "While the challenged judge and all parties must be served with the statement of disqualification, the matter need not be set for hearing. Moreover, while the judge determining the issue may request argument or evidence from the other parties, he is not obligated to do so. Accordingly, [a party] cannot complain that it was not given an opportunity to be heard before the judge was disqualified." (*Ibid.*) Permitting a party to defend the propriety of allegedly unethical conduct and bias where the challenged judge refuses to respond at all to the charges, and is therefore deemed to have consented to the allegations in the statement of disqualification, would wreak havoc with the disqualification process prescribed by the Legislature in section 170.3.

Because she pursued neither of the options provided by subdivisions (c)(2) and (c)(3) of section 170.3, Perkovich left Presiding Judge Stone with no alternative but to deem her to have conceded disqualification on the factual bases alleged in Tracy's motion. Perkovich could have avoided this result by consulting section 170.3 and following one of the options it sets forth for responding to a statement of disqualification. Blevans's office specifically called her attention to the statute in a letter sent to Perkovich the day after Tracy filed the statement of disqualification. While this letter omitted reference to the option that would have permitted Perkovich to do what Jose now maintains she should be seen as having done—remove herself from the case without conceding the disqualification—this option would have been apparent if Perkovich had referred to the statute.[26] (§ 170.3, subd. (c)(2).) As authorized by section 170.3, provided Judge Stone decided the disqualification issue solely on the basis of the

---

[26] The letter stated that within 10 days after service of a motion to disqualify, a challenged judge may (1) consent to disqualification (§ 170.3, subd. (c)(3)), (2) file a verified answer admitting or denying the allegations and setting forth any additional facts (§170.3, subd. (c)(3)), or (3) do nothing, in which case the judge will be deemed to have consented to disqualification (§ 170.3, subd. (c)(4)). It did not mention subdivision (c)(2).

statement of disqualification (§ 170.3, subd. (c)(6)); he did not conduct an evidentiary hearing (*ibid.*) because Perkovich did not seek or provide any need for a hearing. And while we recognize that Judge Stone made "no finding" as to the truth of the allegations of Tracy's statement of disqualification, the legal effect of Perkovich's failure to file a response was that she effectively conceded disqualification was warranted on the grounds alleged and no factual determination by the court was required.

The dissent objects to our application of these principles on the theory that Perkovich's letter, although neither verified nor stated under penalty of perjury, was a "response" to the statement of disqualification. In the sense that it was written in reaction to the statement of disqualification, yes. But rather than admitting or denying Tracy's allegations, the letter was dismissive of the claimed inadequate disclosure, made no mention of the detailed examples of conduct Tracy claimed reflected actual bias, and requested recusal for a reason independent of the alleged basis for disqualification— Perkovich's professed fear of Tracy. Perkovich was not attempting to "answer" the statement of disqualification within the meaning of section 170.3; she was attempting to circumvent the procedures required by the statute.[27]

We also take issue with the insistence of the dissent that Tracy's motion to disqualify was untimely. To be sure, the motion was filed long after the conference at which Perkovich assertedly made her verbal disclosures. But the dissent utterly disregards Tracy's claim that she did not hear or understand the significance of any such disclosures. Tracy claimed that she learned Perkovich had not disclosed her mutual

---

[27] The dissent suggests that by refusing to view Perkovich's letter as an answer we are unfairly holding Perkovich to the letter of the law while excusing Tracy's failure to file the correct document as her statement of disqualification. Tracy's motion to disqualify Perkovich was sufficient because it met the requirements of the statute: It objected to the temporary judge's participation and stated the basis for the claimed disqualification, and its execution under penalty of perjury served the purpose of verification. (*Urias, supra,* 232 Cal.App.4th 415; *Hollingsworth v. Superior Court, supra,* 191 Cal.App.3d at pp. 25-26.) The same cannot be said of Perkovich's letter, which was neither verified nor executed under penalty of perjury and sought recusal for a reason independent of the alleged bases for disqualification.

judging relationship with Blevans in writing or on the record only after her current counsel sought documentation of Perkovich's disclosures and Perkovich responded that they had been made verbally at the October 2012 conference. Tracy filed her motion to disqualify two weeks later. It is only by assuming Tracy's claim to be untrue that the dissent can view her to have violated the requirement of moving for disqualification "at the earliest practicable opportunity." (§ 170.3, subd. (c)(1).) The record provides no basis for this assumption; on the contrary, under the principles just discussed, Tracy's allegations must be taken as true. Perkovich could have challenged the timeliness of the disqualification motion, but she chose not to do so.

Jose claims it would raise "fundamental due process concerns" if Tracy's allegations were accepted as true for any purpose that would "adversely affect Jose." The authority he cites is *In re Marriage of Kelso* (1998) 67 Cal.App.4th 374 (*Kelso*), a marital dissolution proceeding in which the wife's former attorney sought attorney fees and costs. The commissioner presiding over the case recused himself from determining that issue, stating he was biased against the former attorney, but then, at a hearing with no notice to the former attorney or opportunity for her to be heard, addressed "the whole issue of attorney fees" and ordered the wife to pay $5,000 as a sanction for making the litigation unduly acrimonious. (*Id.* at pp. 379-381.) The new judge to whom the issue of the former attorney's fees had been assigned then refused to conduct a hearing, finding it would be futile in light of the commissioner's findings that the wife was not entitled to any award of attorney fees and costs. Reversing, the Court of Appeal explained that the judge should not have relied upon findings made by the commissioner after he had recused himself and without providing the former attorney an opportunity to be heard. Because the right to the award is the party's, not the attorney's, "a judicial officer who is disqualified from ruling on the motion because of bias against the attorney cannot rule on the motion indirectly by ruling against the party. The issues are too intertwined to permit such a splitting of the disqualification." (*Id.* at p. 383.)

Jose describes *Kelso* in a parenthetical as holding that "it is error to give conclusive effect to the findings of a Commissioner that were made after he recused

himself and without affording one party the opportunity to be heard," and does not otherwise explain its applicability to the case at hand. But the situations have nothing in common. In *Kelso*, the commissioner tried to justify adjudicating matters he was disqualified from hearing by artificially separating the interests of the attorney he was biased against from those of the wife, resulting in the former attorney being denied her right to a hearing on the previously reserved issue of her right to a fee. The case says nothing about a party's right to be heard when a challenged judge declines to contest the allegations of a statement of disqualification under section 170.3.[28]

Jose does not explain how he is "adversely affect[ed]" by the factual allegations of the disqualification statement being taken as true. Presumably, his concern is with having lost his chosen decision maker and her rulings, as well as the time and money spent on all the proceedings. As we have no occasion to review the merits of the rulings involved here, neither Jose nor this court can anticipate whether the ultimate outcome of the dissolution proceedings will be more or less favorable to him. While we recognize that a party may be adversely affected by the disqualification of a judge who has participated in a complex proceeding, that price may have to be paid. It is justified by the need for enforcement of the disqualification statutes, which are designed " 'to ensure public confidence in the judiciary and to protect the right of litigants to a fair and impartial adjudicator . . . .' " (*Peracchi v. Superior Court* (2003) 30 Cal.4th 1245, 1251.)

Under section 170.3 and the caselaw we have discussed, we conclude that Perkovich was disqualified for the reasons stated in the statement of disqualification—that is, because a person aware of her failure to disclose her mutual judging relationship with Blevans in writing or on the record, and her conduct indicative of bias and prejudice, might reasonably entertain a doubt about her impartiality. The cases Tracy relies upon, culminating most recently in *Christie,*

---

[28] The only other authority Jose cites on this point—also without explanation of its relevance to the present situation—is section 2033.410. This provision of the California Civil Discovery Act of 1986 provides that "[a]ny matter admitted in response to a request for admission" is "binding only on that party" and only "for the purpose of the pending action." This discovery rule does not dictate the effect of the procedures specified in the statutes governing judicial disqualification.

32

*supra,* 135 Cal.App.4th 767, and *Rossco Holdings, supra,* 149 Cal.App.4th 1353, compel us to also agree with her contention that all the orders issued by Perkovich were void.

In *Christie* the trial court set aside a nonsuit and dismissal in favor of the city, its police department, and police officers in an arrestee's action for false arrest and wrongful imprisonment. The trial court granted a new trial after finding that the judge who granted the nonsuit was disqualified to act in the matter as of the time at which he had had a conversation with a previously disqualified judge. Having found the judge who granted nonsuit disqualified to rule on the matter, the trial court set aside the resulting dismissal as void.

In affirming this determination, the Court of Appeal explained that "[e]xcept in very limited circumstances not applicable here, a disqualified judge has no power to act in any proceedings after his or her disqualification." (*Christie, supra*, 135 Cal.App.4th at p. 776.) Significantly, the appellate court emphasized that "disqualification occurs when the facts creating disqualification arise, not when disqualification is established. [Citations.] The acts of a judge subject to disqualification are void or, according to some authorities voidable.[29] [Citations.]" (*Ibid*.)

*Rossco Holdings, supra*, 149 Cal.App.4th 1353, which relied on *Christie*, was an action by a trust against a bank alleging numerous causes of action in tort and contract arising from financial transactions. The bank sought and obtained arbitration and an arbitration award was entered in favor of the bank. The parties filed cross-petitions to vacate and confirm the award.

---

[29] In *Urias, supra,* 234 Cal.App.3d at pages 423-424, the court held acts of a disqualified judge voidable, not void, based in part on the reasoning of Witkin: "Witkin notes little is accomplished by calling the judgment of a disqualified judge 'void'; the problem is one of jurisdiction. While the disqualified judge totally lacks power to hear and determine the cause, the court itself is not without jurisdiction. [Citation.] But the court, with subject matter jurisdiction, may properly be held to lack jurisdiction to act while the judge is disqualified. The problem is more accurately one of excess of jurisdiction. [Citation.] 'Consequently, the actions of a disqualified judge are not void in any fundamental sense but at most voidable if properly raised by an interested party.' (*In re Christian J.* (1984) 155 Cal.App.3d 276, 280.)" The *Christie* court, after discussing the view of *Urias* and some other courts, held the acts of a disqualified judge "void" because the Supreme Court had said so in *Giometti v. Etienne* (1934) 219 Cal. 687, 689, and had never reconsidered the proposition. (*Christie*, at pp. 779-780.)

The trial judge who had issued the order compelling arbitration, the Honorable Alexander Williams III, disqualified himself under section 170.1, subdivision (a)(8), because he had engaged in conversations with private dispute resolution providers regarding possible employment prior to issuing his order compelling arbitration. After the matter was transferred to a new judge, the trial court granted the trust's motion to vacate the order compelling arbitration due to disqualified Judge Williams' lack of authority to issue that order.

The Court of Appeal held that Judge Williams was properly disqualified under section 170.1 and the order compelling arbitration was void. Quoting *Christie*, *supra*, 135 Cal.App.4th 767, the court explained: " '[D]isqualification occurs when the facts creating disqualification arise, not when the disqualification is established' [Citation.] '[I]t is the fact of disqualification that controls, not subsequent judicial action on that disqualification.' [Citation.] On February 25, 2004, Judge Williams had before him a motion to compel arbitration in this case. At that point in time he had, within the past two years, participated in discussions regarding prospective employment as a dispute resolution neutral. He was therefore disqualified from the case, regardless of his lack of knowledge of the law providing for his disqualification. His order compelling arbitration was therefore void." (*Rossco Holdings, supra*, 149 Cal.App.4th at p. 1363; § 170.1, subd. (a)(8)(A).)

Tracy also relies on *Urias, supra,* 234 Cal.App.3d 415, in which, after summary judgment was granted for the defendant, the plaintiff's attorney learned that the judge's former law firm had represented the defendant for the past 10 years. The court held that, "[b]ecause the summary judgment had been rendered by a disqualified judge, the judgment was voidable upon the plaintiff's objection." (*Id*. at p. 426.)

In short, Tracy contends the caselaw establishes that Perkovich's orders were all void and must be set aside because all issued after Perkovich's failure to comply with the Code of Judicial Ethics, which constituted one of the grounds for disqualification.

Jose disagrees, arguing that the cases Tracy relies on are all inapplicable because the facts establishing disqualification in those cases were undisputed, whereas those in the present case are disputed. As we have explained, Perkovich's failure to file a consent or answer to the statement of disqualification established the truth of the facts it alleged. There

34

is no basis for Jose's apparent assumption that the rulings of a judge who neither consents to disqualification nor answers a motion to disqualify cannot be declared void and vacated without an independent judicial hearing as to whether the unanswered allegations of the statement of disqualification are true and constitute grounds for disqualification.

It is important to clarify that we are not holding that the facts alleged in the statement of disqualification have been determined to be true for any purpose other than establishing the basis of disqualification and consequences thereof. Nor are we making an independent factual finding that Perkovich failed to verbally disclose the mutual judging relationship or that she was in fact biased and prejudiced against Tracy, matters upon which we express no opinion. What we *are* saying is that by operation of the disqualification statute, the facts alleged in the statement of disqualification and not disputed by the challenged judge must be taken as true for purposes of determining the basis and effect of a disqualification order.

None of the alternative arguments Jose advances in order to sustain Perkovich's rulings stands up to scrutiny. The first is that, even if Perkovich did violate canon 6D(5)(a), her orders should not be deemed void and set aside because section 170.3, subdivision (b)(4), provides that if a judge is disqualified before he or she has completed judicial action in a proceeding, "in the absence of good cause the rulings he or she made up to that time shall not be set aside by the judge who replaces the disqualified judge." As earlier explained, "disqualification occurs when the facts creating disqualification arise, not when the disqualification is established." (*Christie, supra*, 135 Cal.App.4th at p. 776; *Rossco Holdings, supra*, 149 Cal.App.4th at p. 1363.) The facts creating disqualification in this case first occurred in October 2012, when Perkovich was required, but failed, to make her on the record disclosures. This preceded all of her rulings.[30] In these circumstances, preserving the orders she made prior to the disqualification order

---

[30] Jose appears to believe Perkovich's first and only disqualifying act was her October 16, 2014, letter to the presiding judge requesting recusal due to Tracy's hostility, which led Perkovich to fear for her personal safety. But Perkovich's letter, which she delivered to the presiding judge *after* Tracy filed her statement of disqualification, was not a ground upon which Perkovich was sought to be or ordered disqualified.

would undermine the purpose of the ethical rules she violated and the disqualification procedure.

While the text of section 170.3, subdivision (b)(4)—"[i]f grounds for disqualification are first learned of or arise after the judge has made one or more rulings . . . in the absence of good cause the rulings he or she has made up to that time shall not be set aside"—read literally and in isolation, might support Jose's reading, the context in which this text appears demonstrates it does not apply to the situation presented in this case. Subdivision (b) of section 170.3 addresses only the situation of "[a] judge who determines himself or herself to be disqualified." Subdivision (b)(4), therefore, necessarily applies when the grounds for disqualification "arise after" or "are first learned of" *by the judge.* This makes sense, because the rulings made prior to the existence or knowledge of the disqualifying facts likely were not affected by them. Outside the context of a judge recognizing his or her own disqualification, subdivision (b)(4) does not apply. Aside from the fact that this conclusion is required by the structure of the statute, to conclude otherwise would be to validate rulings made by a judge who was disqualified at the time the rulings were made simply because the parties had not yet learned of the grounds for disqualification.

Jose's argument is also unavailing because consideration of the circumstances he relies upon to show the absence of good cause to vacate Perkovich's rulings would effectively vitiate the ethical obligation she failed to discharge. The mitigating circumstance Jose relies on most heavily is that Perkovich "fully and completely disclosed her prior professional relationships with counsel for the parties' and the parties' forensic CPAs" at the first settlement conference on October 30, 2012, and Tracy was not prejudiced by the fact that the disclosures were not made on the record within five days of her designation as a temporary judge. But the fact and effect of a verbal disclosure is disputed: Tracy insists she did not hear Perkovich describe her professional relationship with counsel. Moreover, Jose ignores the fact that Munsill, the only one of Tracy's attorneys with whom Perkovich had a professional relationship and knew of the relationship with Blevans, quickly substituted out as Tracy's attorney and Perkovich never disclosed her professional relationship with Blevans

36

to the attorneys who represented Tracy during almost all of the proceedings, until one of them finally sought the disclosures that were never made in writing or placed on the record.

Munsill's departure from the case also defeats Jose's suggestion that because Perkovich's mutual judging relationships were with counsel for "both parties," she lacked any incentive to favor one over the other. Even if Munsill had remained, the argument misses the point. There is no telling how a temptation to stray from impartiality in one direction may balance out against a temptation pulling in another direction. If there is conflict of interest adverse to a party, that party is entitled to know and to make a decision whether to proceed regardless of whether there is a second conflict that may work in her favor. It would distort the purpose of ethical rules to say that a failure to disclose a relationship with one party is excused because the judge *also* failed to disclose a relationship with the opposing party.

In any case, the reason both disclosure and any waiver are required to be in writing and/or on the record is to eliminate use of other, much less certain, factors of the sort Jose relies upon to create doubt whether disclosure has been made or disqualification waived. The wisdom of requiring both disclosure and waiver to be in writing or on the record is dramatically demonstrated by this case, as is the need to enforce the requirement rigorously. The parties dispute whether Tracy was aware, or can be charged with knowledge, of the verbal disclosures Perkovich represents she made, as well as the scope of the disclosure. In the absence of documented disclosures and a documented waiver, we are presented with a sideshow of competing declarations and deposition transcripts describing what the participants in the October 2012 settlement conference—the parties, the lawyers, two expert witnesses and the temporary judge herself—remembered two years later about what Perkovich said and how Tracy responded. There have been discovery disputes, motions, and writ proceedings—all relating to issues completely extraneous to the primary dispute between the parties. The dispute over whether there was a disclosure and whether there was a waiver, and if not, the effect of the disqualification, has consumed an inordinate amount of the trial court's and this court's time, not to mention the parties' and their counsel's, and significantly delayed the ultimate resolution of the case.

37

Lauding the many virtues of private judges in matrimonial cases, which we do not dispute, our dissenting colleague takes us to task, first, for "showing no appreciation for the realities of the situation, no consideration for what I understand, anecdotally at least, to be the real life facts facing trial judges," and, secondly, for our indifference to the fact that Perkovich lacked the resources available to sitting judges sought to be disqualified and had to act "on her own." (Dis. opn. at pp. 11-12.) With all due respect, we think it is the dissent that ignores the pertinent realities, and also Perkovich's deliberate disregard of the statutory disqualification scheme.

The reality that seems to us most pertinent to this case is that, unlike permanent judges, temporary judges operate in a context that greatly increases the likelihood of potential conflicts. Temporary judges have broad powers substantially comparable to those of a sitting judges (*In re Estate of Kent* (1936) 6 Cal.2d 154, 163), but most who serve as temporary judges simultaneously maintain private law practices, as in this case. Consequently, these lawyer/judges commonly engage in continuing business relationships with lawyers likely to come before the court to which they are appointed—unlike public judges, who are precluded from doing so by the provision of canon 4D(1)(b) that "[a] judge shall not engage in financial or business dealings that . . . involve the judge in frequent transactions or continuing business relationships with lawyers or other persons likely to appear before the court on which the judge serves." This is particularly true within a specialized field like matrimonial law, the legal area most private judges engage in. (Nagaraj, *The Marriage of Family Law and Private Judging in California* (2007) 116 Yale L.J. 1615, 1617 [more than half of private judges' cases in California are family law disputes].) The private practice of most temporary judges therefore presents a greater likelihood reasonable doubt can be cast on their impartiality than on that of permanent judges. Moreover, because temporary judges are appointed and supervised by the presiding judges of the superior courts, doubts about the impartiality of private judges may also reflect adversely on the integrity of the California judicial system.

The gravity of this danger, and the likelihood lawyers who serve as temporary judges may not be as acculturated as full time judges to the demands of the Code of Judicial Ethics,

38

are undoubtedly reasons the Rules of Court require such lawyers to certify to their awareness of and compliance with "applicable provisions of canon 6 of the Code of Judicial Ethics and the California Rules of Court." (Rule 2.831(b).)

Although disclosure may be onerous, matrimonial practitioners (and others who frequently participate in the private judging process) have a greater interest in assiduous disclosure than they may realize. As one such practitioner has pointed out, the use by the "small and collegial" family law bar "of our friends, colleagues, and prior opposing counsel as private judges unwittingly exposes all of us, as a community and as individuals, to potential liability for violations of the various ethical canons, claims of cronyism, allegations of bias, complaints of self-dealing, and malpractice law suits. I believe that we are well intentioned, but I also believe the problems related to the inter-relationships of our bar in this way have been under-discussed' and 'under-examined.' " (Hersh, *Ethical Considerations in Appointing our Colleagues as Private Judge,* 31 Family Law News 31 (Issue No. 4, 2009), official publication of the California State Bar, Family Law Section.) [31] The requirement that disclosure be "in writing or on the record," as well as that any waiver of disqualification be in writing and recite the basis of disqualification (§ 170.3, subd. (b)(1)), cannot be treated casually by a temporary judge except at his or her peril—and also that of the system of private judging in California.

The dissent's lament that Perkovich lacked the resources available to permanent judges sought to be disqualified, and was obliged to act on her own, is unconvincing. First of all, Blevans informed Perkovich of the requirements of the disqualification scheme spelled out in section 170.3 and advised her to either consent to disqualification or answer the motion (see fn. 27, *ante*, at p. 30), which advice she ignored. Secondly, the alternatives available to Perkovich set forth in section 170.3 are not complicated. Finally, as we have said, the dissent's acceptance of Perkovich's hand delivered letter to Judge Stone—which was highly unprofessional in several

---

[31] The practice of the author of this article, which she recommends to her colleagues, is to send a letter to the individual under consideration for appointment as a temporary judge or referee requesting detailed written disclosures of specified matters prior to the signing of the stipulation and order.

ways—as the functional equivalent of a "written verified answer" to the motion to disqualify (dis. opn. at pp. 13-14) that satisfies the requirements of section 170.3, subdivision (c)(3), seems to us extraordinarily unjustified.

Jose and the dissent suggest that the stipulation and order designating Perkovich temporary judge, which was signed by the parties and their attorneys, should be considered a timely waiver of the "on the record" disclosure requirement. They rely on paragraph 4 of the stipulation, which simply states: "Both parties waive the clerk's minutes." The obvious meaning of this brief sentence is simply that the parties intended to forego formal clerk's minutes for the proceedings to be held before the temporary judge. It is a waiver of formal clerk's minutes in general, making no reference to disclosures or otherwise suggesting it was designed to eliminate the need for the written or on the record disclosure mandated by the Code of Judicial Ethics. The fact that memorialization in the clerk's minutes is among several ways a disclosure can be placed on the record[32] does not provide a sufficient basis upon which to infer that the parties' choice to forego formal clerks' minutes in general constitutes a waiver of the specific requirement for on-the-record disclosure. And in any event, paragraph 4 certainly did not waive the alternative means by which the statute allows a disclosure to be documented—"in writing." If the parties' choice to forego a formal record meant disclosures were not required to be, or could not be, made "on the record," it was incumbent upon Perkovich to make them "in writing" as required by canon 6D(5)(a).

As for Jose's argument that Tracy waived disqualification after Perkovich verbally disclosed her professional relationships with counsel, as we have said, section 170.3, subdivision (b)(1), requires a waiver of disqualification to "recite the basis for the

---

[32] The Committee on Judicial Ethics Opinions, which operates under the aegis of the California Supreme Court, has pointed out that one of the ways in which a disqualifying disclosure can be placed "on the record" pursuant to canon 3E(2)(a) when there is no court reporter or electronic recording of the proceedings is to "[e]nter the disclosure document in the case file as a minute order, official court minutes, or a formal order." (California Supreme Court, Committee on Judicial Ethics, *Disclosure on the Record When There is no Court Reporter or Electronic Recording of the Proceedings*, Formal Opinion No. 2013-002 (Dec. 11, 2013) at p. 9.)

40

disqualification" and to be "signed by all parties and their attorneys and filed in the record."
(§ 170.3, subd. (b)(1).) No such waiver exists in the present case. Jose maintains section
170.3, subdivision (b)(1), is inapplicable because it relates to the situation in which a judge
"determines himself or herself to be disqualified after disclosing the basis for his or her
disqualification on the record," [33] and Perkovich did not find herself disqualified. But
neither Jose nor the dissent, which adopts Jose's argument, explains how Perkovich's failure
to disclose the basis for her disqualification can excuse the requirement of a written waiver
that would apply if she had properly determined herself disqualified after disclosing the basis
of that determination. The information Perkovich was obliged to disclose was clearly
disqualifying—a professional relationship between the temporary judge and counsel for one
of the parties in which each had the power to determine the outcome of the other's cases,
thereby affecting each other's financial and professional interests.[34] Neither her failure to
disclose those disqualifying facts as required, nor any failure on her part to recognize that
they were disqualifying, can relieve Perkovich of the additional obligation to obtain a written
waiver that describes the disqualifying conduct to which it refers. Accepting the dissent's
view that the requirement of a written waiver applies only where the judge actually finds
himself or herself disqualified would permit a disqualified judge to avoid the consequences
of disqualification, even in the absence of a waiver, by simply failing to acknowledge his or
her own disqualifying conduct. Such a result cannot be countenanced.

Finally, the implied waiver cases Jose relies upon are inapposite. To be sure,
parties can waive disqualification by their conduct where they are aware of grounds for

---

[33] Section 170.3, subdivision (b)(1), provides in full: "A judge who determines
himself or herself to be disqualified after disclosing the basis for his or her
disqualification on the record may ask the parties and their attorneys whether they wish to
waive the disqualification, except where the basis for disqualification is as provided in
paragraph (2). A waiver of disqualification shall recite the basis for the disqualification,
and is effective only when signed by all parties and their attorneys and filed in the
record."

[34] That Perkovich initially had mutual judging relationships with the attorneys for both
parties is of no consequence. As we have said, the failure to disclose a relationship with one
party cannot be excused by the judge's failure to disclose a relationship with the opposing party.

41

disqualification but continue to participate in the proceedings without raising the objection. (*People v. Johnson* (2015) 60 Cal.4th 966, 978-979 (*Johnson*) [judge disclosed close personal and professional relationship with prosecutor; defense counsel stated readiness to proceed and defendant personally agreed]; *Las Canoas Co., Inc. v. Kramer* (2013) 216 Cal.App.4th 96, 101 [trial judge in civil suit against court reporter disclosed having used reporter's services in private practice; disqualification claim forfeited by counsel declining when court asked for any comment on disclosure]; *In re Steven O.* (1991) 229 Cal.App.3d 46, 55 (*Steven O.*) [referee who presided over hearings on two juvenile supplemental petitions alleging probation violations had been prosecutor on original petition; failure to object in juvenile court forfeited issue where minor was present at hearings where referee appeared as prosecutor and defense counsel had access to records that would reveal referee's earlier involvement]; *Tri Cities Bank v. Superior Court* (2008) 167 Cal.App.4th 1332, 1336-1338 [motion to disqualify judge for improperly undertaking independent investigation of facts untimely where facts known but not raised until after adverse ruling on issue in case and unsuccessful writ petition].)  But here, Tracy stated that she was not aware of Perkovich's mutual judging relationship with Blevans until shortly before she filed her statement of disqualification.  By failing to answer the statement of disqualification, Perkovich conceded these facts.  Perkovich was disqualified as of the time she should have disclosed her professional relationship with respondent's attorney in writing or on the record.

None of the implied waiver cases upon which Jose and the dissent rely purport to establish a rule applicable in all circumstances, and none involve the circumstances presented here.  These cases address waiver of known bases for disclosure; none address waiver of the disclosure itself, and none involved a clearly disqualifying direct conflict of interest like the one presented here or an unwaivable claim of personal bias and prejudice.  In *Johnson*, *supra*, 60 Cal.4th at pages 977-979, the judge disclosed a close personal and professional relationship with the prosecutor, stating that " 'there was never anything inappropriate,' " they did not discuss business, and " 'there's always a separation and a distance from what I do as a judge.' " Defense counsel represented that he had explained to the defendant that in his experience,

judges with whom he had personal relationships nevertheless ruled impartially, and both counsel and the defendant agreed to proceed.  The potential conflict in *Johnson* was thus the amorphous possibility of the judge favoring one attorney, perhaps unconsciously, due to familiarity and personal fondness.  (See also, *Las Canoas Co., Inc. v. Kramer*, *supra*, 216 Cal.App.4th at p. 101 [judge in civil suit against court reporter disclosed having used the reporter's services in private practice].)  The risk of divided loyalty, conscious or unconscious, is considerably stronger where, as here, the temporary judge has a direct professional incentive to favor an attorney who has been and likely again will be in a position to determine the outcome of cases in which the present temporary judge acts as an attorney.

In *Steven O.*, *supra*, 229 Cal.App.3d at page 55, the issue was that the referee who presided over hearings on two juvenile supplemental petitions alleging probation violations had been the prosecutor on the original petition.  The prior representation may have given the now-judge background information about the minor, but to the extent any such information went beyond what was presented at the hearings on the probation violations, judges often are called upon to put aside inadmissible evidence of which they are aware.  That the judge has heard these things "does not mean that [s]he cannot divorce them from [her] mind.' " (*People v. Scott* (1997) 15 Cal.4th 1188, 1206 (*Scott*), quoting *People v. Beaumaster* (1971) 17 Cal.App.3d 996, 1009.)  In *Scott* at page 1207, the defendant argued on appeal that the judge who presided over his court trial should have disqualified herself because, at pretrial hearings for which he was not present, the judge received information that made it impossible for her to remain impartial.  The court noted (in the context of a different issue) that the information the judge had received was not of a type that would undermine the judge's impartiality, as the pretrial hearings were solely concerned with ensuring a defense witness would appear for trial and not with the witness's credibility.  The same reasoning—that a judge is presumed able to put aside inadmissible information—applies to *Tri Cities Bank , supra,* 167 Cal.App.4th at pages 1336-1338, in which the judge allegedly undertook an improper independent investigation of facts.

In our view, none of the foregoing cases supports excusing the statutory requirement of a written waiver where a judge who has business and professional relationships with counsel

in the proceeding that constitute an actual direct conflict of interest, and are required to be disclosed on the record in writing, fails to make the disclosures as required and then fails to contest a statement of disqualification based on the insufficient disclosure. A fortiori they do not excuse the requirement when the alleged basis of disqualification is conduct indicating actual bias.

Drawing on the evidence discussed above that Perkovich verbally disclosed her mutual judging relationships with both Blevans and Munsill at the October 2012 settlement conference, and Tracy's claim that she did not hear such disclosures, Jose and the dissent emphasize that a client's personal waiver is not necessary where counsel chooses not to challenge a judge. (*Johnson*, *supra*, 60 Cal.4th at p. 980; *Scott*, *supra*, 15 Cal.4th at p. 1207.) Aside from our view, just discussed, that implied waiver does not apply in the particular circumstances of this case, it is worth observing that *Johnson,* while stating that "deciding whether to challenge a judge" is one of the tactical decisions surrendered by a defendant represented by professional counsel, in fact involved a defendant who, after the judge disclosed his relationship with the prosecutor, personally stated his agreement with his attorney's belief the judge would be fair. (*Johnson*, at p. 979.) We question whether the same rule should control in a case where the client and his or her current counsel are unaware of a disqualifying conflict of the sort presented here. *Scott,* the case *Johnson* relied upon in holding a personal waiver was not required, involved facts suggesting the defendant may not have been aware of the alleged basis for disqualification, which was based on the judge's receipt of information at pretrial hearings at which the defendant was not present. (*Scott*, at p. 1207.) As indicated above, however, the information was not of a type that threatened to undermine the judge's impartiality. (*Ibid.*) *Scott,* in turn, relied upon *In re Horton* (1991) 54 Cal.3d 82, 95, a case which did not involve disqualification but rather held that defense counsel could impliedly stipulate to trial before a court commissioner without the defendant having personally waived his right to a regularly elected or appointed superior court judge.

Of most fundamental significance, none of the implied waiver cases upon which Jose and the dissent rely involved a private judge. As we have explained, and as this case

44

illustrates, private judges are not insulated in the way public judges are: Unlike public judges, they often have continuing and reciprocal business relationships with the lawyers who appear before them. Because private judges operate within a system in which potential conflicts are likely, adherence to requirements for written or on the record disclosure and waiver is imperative. Viewing the decision whether to waive a judge's conflict as a tactical one to be exercised by the attorney, even if the client is unaware of the facts, takes on a different light in the context of private judging, where it is possible for three attorneys— opposing counsel and the temporary judge—to mutually agree to work on each other's cases to serve their own professional interests, which may or may not align with those of their clients.

Finally, Jose argues that, waiver aside, the failure of a temporary judge to disclose potential conflicts in the manner prescribed by the Code of Judicial Ethics "does not, without more, result in disqualification." The dissent agrees. The argument that a violation of the disclosure requirement of canon 6D(5)(a) , standing alone, cannot support disqualification— a proposition not supported by the cases Jose relies upon[35]—presents an interesting question. But this is not Tracy's claim. Tracy's argument is that a person aware that Perkovich had a mutual judging relationship with Jose's lawyer and failed to disclose it in the manner required by the Code of Judicial Ethics "might reasonably entertain a doubt that [she] would

---

[35] In *Wechsler v. Superior Court* (2014) 224 Cal.App.4th 384, the first case he relies on, upon learning that the commissioner presiding over a dissolution action had agreed to officiate at the wife's counsel's wedding, the husband filed a statement of disqualification; the commissioner filed an answer denying any disqualifying conduct, the disqualification motion was denied and the appellate court affirmed the finding that, because the commissioner was not a personal friend but solely the officiant, the objective standard for disqualification was not met. (*Id*. at pp. 387, 395.) The court emphasized, however, that disclosure was required. (*Id.* at pp. 395-396.) *People v. Martinez* (1978) 82 Cal.App.3d 1, the other authority Jose offers, held that a criminal defendant was not prejudiced by the judge, in chambers, telling students observing the trial that he believed the defendant was guilty, because the jury did not hear the remarks and the judge's rulings did not reflect prejudice. (*Martinez*, at pp. 16-17.) Neither of these cases has any bearing on the consequence of a private judge ordered disqualified after failing to answer a statement of disqualification alleging violation of a disclosure requirement.

45

be able to be impartial." (§ 170.1, subd. (a)(6)(A)(iii).) In other words, Tracy's nondisclosure claim is not that Perkovich's failure to properly disclose is disqualifying in and of itself; the claim rests as well on the nature of the information she failed to reveal in writing and on the record, which itself may reasonably be seen as an indication of partiality. The claim of nondisclosure therefore does not "stand alone."

The nondisclosure claim also cannot be said to "stand alone" because it is accompanied by the independent claim that Perkovich was actually biased against Tracy. Not only did Perkovich decline to formally contest the allegation of actual bias, her letter to Judge Stone—complaining for the first time about hostile conduct some 10 months earlier—provides reason to believe the allegation.[36] Furthermore, unlike the failure to disclose, which can be waived, a claim that the judge "has a personal bias or prejudice against a party" cannot be waived. (§ 170.3, subd. (b)(2)(A).) In short, entirely apart from the alleged failure to properly disclose, Tracy's motion to disqualify alleges a sufficient basis upon which to disqualify Perkovich.

Finally, it deserves to be emphasized that all of the arguments advanced by Jose and the dissent as to why Tracy should be seen as having waived disqualification, or the claims upon which she sought and obtained disqualification were untimely or otherwise untenable, *could have been raised by Perkovich herself*, *and a hearing on those claims could have been conducted by the trial court*. The most legally significant factor in this case, it seems to us, is not Perkovich's asserted failure to disclose in writing or on the record as required, nor even her alleged bias and prejudice. As indicated, like the trial judge, we make no independent findings on those matters. The regnant factor is instead

---

[36] Perkovich's last direct contact with Tracy was at the settlement conference in December 2013. The record certainly reflects Tracy's uncooperative, agitated, and disruptive conduct and verbal expressions of anger, including loud and "aggressive" demands to see Jose at the December 2013, conference described by Blevans, Elmore, and another of Jose's attorneys, the heated exchange at the July 30, 2013 hearing, and "strange" emails from Tracy to Jose. We are not aware of any suggestion of threat of physical harm, nor of any contact between Tracy and Perkovich for approximately 10 months preceding Perkovich's letter.

46

Perkovich's complete indifference to the legal rules regarding the disqualification process specified in section 170.3. As provided in subdivision (c)(2) of that statute, Perkovich, without conceding her disqualification, could have simply requested any other judge agreed upon by the parties to sit and act in her place; but she did not. Alternatively, as provided in subdivision (c)(3), she could have filed a written verified answer denying any or all of the allegations of Tracy's statement of disqualification and set forth "any additional facts material or relevant to the issue of disqualification," but she did not do that either. The result of those failures, and also her failure to consent to disqualification (§ 170.3, subd. (c)(3)), is that, as Judge Stone found, she must be "deemed to have consented to her disqualification." The statement of the Supreme Court, echoed by the Courts of Appeal, that where a judge "has failed to file a written answer to the statement of bias and prejudice . . . [citation], the facts alleged in the statement must be taken as true" (*Calhoun v. Superior Court, supra*, 51 Cal.2d at p. 262) declares a rule of law. Unlike Jose, and also our dissenting colleague, we are unwilling to treat that rule of law as if it were an equitable doctrine, whose application is not universal but depends upon circumstances that will vary from case to case. Doing so would undermine the uniformity, certainty, and predictability essential to effective enforcement the disqualification process, which strengthens the integrity of the judicial process.[37]

---

[37] The dissent's suggestion that our decision will wreak havoc by invalidating orders in any case where a private judge did not strictly comply with the requirement of canon 6D that disclosure be made in writing or on the record is, we believe, greatly exaggerated. Several unusual circumstances combined to present the problem we have addressed in this case: An experienced private judge failed to place her disclosures in writing or on the record, a party sought to disqualify the temporary judge for this reason and for alleged actual bias, and the challenged temporary judge failed to seek replacement without conceding disqualification or to file a consent or an answer contesting the allegations. We will not presume that temporary judges commonly disregard the requirements of the Code of Judicial Ethics. And it cannot be common for a temporary judge who is challenged to fail to respond to a statement of disqualification in any of the ways prescribed by section 170.3. The result we have reached in this case would not obtain absent these unusual circumstances. Moreover, if the dissent is correct that temporary judges routinely ignore the requirement of canon 6D(5)(a) that disclosures

47

For the foregoing reasons, we conclude that Perkovich's orders were all void at the time they issued and must be vacated, regardless whether they were legally correct.[38] (*Cadenasso v. Bank of Italy* (1932) 214 Cal. 562, 568-569; *Rossco Holdings, supra*, 149 Cal.App.4th at p. 1367.)

### Perkovich Cannot in This Proceeding Be Required to Refund Fees She Received for Her Services

Tracy claims that due to Perkovich's failure to comply with her ethical obligations, Tracy is entitled to a refund of the fees she paid Perkovich. The claim is based on *Aguilar, supra,* 113 Cal.App.4th 1072, which confirmed that " '[i]t is settled in California that an attorney may not recover for services rendered if those services are rendered in contradiction to the requirements of professional responsibility.' " (*Id*. at p. 1076, quoting *Goldstein v. Lees* (1975) 46 Cal.App.3d 614, 618; accord, *Jeffry v. Pounds* (1977) 67 Cal.App.3d 6, 10-12 [attorney entitled to fees for services rendered *before* breach of professional conduct]; *Clark v. Milsap* (1926) 197 Cal. 765, 785 ["acts of impropriety inconsistent with the character of the profession, and incompatible with the faithful discharge of its duties" prevent an attorney from receiving fees for his or her services].) Acknowledging that no case addresses the question whether a temporary judge who violates the Code of Judicial Ethics is also barred from receiving fees for his or her services, Tracy maintains that no rationale supports the use of a lesser standard for lawyers serving as temporary judges.[39]

---

be made in writing or on the record, there is all the more reason to insist upon adherence to it.

[38] Until further action is taken by the parties or the trial court on remand, the effect of vacating Perkovich's orders will be to return the parties to the positions they were in before the temporary judge entered the case, governed by the superior court's 2012 spousal support order. We recognize, however, that the orders we are vacating required the payment of substantial sums for attorney and expert witness fees and additional amounts of spousal support. We express no opinion on the correctness of any of these orders. On remand, the parties and the trial court will have to devise a practical means of determining the parties' respective rights and obligations with regard to payments or other accommodations that have been made in compliance with Perkovich's void orders.

[39] Since a temporary judge is constitutionally required to be a member of the California State Bar, such a judge who violates canon 6D of the Code of Judicial Ethics

48

Jose has not responded to this argument,[40] and we will not resolve it.  The dispute is between Tracy and Perkovich, and because Perkovich is not a party to these proceedings, we cannot adjudicate her rights to the fees in question.

## II.

### *The MOA was Tainted by Perkovich's Void Rulings and is Therefore Unenforceable Under Section 664.6*

Tracy emphasizes that the MOA was proposed in the wake of a series of adverse rulings issued by Perkovich after Munsill was replaced as her counsel by Jackson, who was unaware of the mutual judging relationships between Perkovich and Blevans.  According to Tracy, Blevans was aware of the hostility between Perkovich and Tracy and her counsel and, in that context, the MOA presented Jackson and Tracy a Hobson's choice:  Considering that Perkovich had repeatedly ruled in Jose's favor, had threatened Tracy with contempt and appeared hostile, Tracy feared her refusal to sign the MOA (which according to Tracy required her to pay "approximately $800,000 per year over a five-year period, and then $300,000 per year for the rest of Jose's life") would likely result in loss of control of the business she founded and had run for two decades.

Tracy now argues that the MOA was tainted by the void rulings that induced it and, therefore, enforcing it under section 664.6 would thwart the policy informing the disclosure requirements.  As she says in her briefs, "[i]f there *is any possibility* that the hostile interactions at hearings or the void orders Perkovich issued impacted the circumstances

---

also necessarily violates rule 1-710 of the Code of Professional Responsibility of the American Bar Association, which requires a temporary judge to comply with canon 6D, and therefore violates his or her ethical obligation both as a temporary judge *and as an attorney*.

[40] In his trial court pleadings in support of Perkovich's request for declaratory relief, Jose raised the different arguments that Tracy's demand for a refund could not be granted because (1) the fees paid were authorized by and consistent with the terms of the Stipulation and Order, which did not authorize the court to order any refund of fees, and (2) the refund request amounted to "an assertion of liability" for improper performance of duties as a pro tem judge and, under *Howard v. Drapkin*, *supra*, 222 Cal.App.3d 843, Perkovich enjoyed quasi-judicial immunity against a suit for "monetary compensation" on this basis.

leading to its execution, the MOA should be declared unenforceable," because "the legitimacy of the judicial system" is at stake.

Preliminarily, we disagree with the dissent's view that this claim is a "180-degree change of position" from the position Tracy took in an earlier writ petition challenging the trial court's denial of the second motion to withdraw the stipulation appointing Perkovich, which had been filed *before Tracy's attorneys learned of the undisclosed mutual judging relationship.* The trial court rejected Tracy's arguments that Perkovich lacked power to rule in the case because of her failure to sign the certification required by rule 2.831(b) and that the terms of the stipulation did not permit her to hear a motion to enforce the MOA.

With regard to the second point, Tracy argued in her writ petition that the stipulation did not allow Perkovich to hear a motion to enforce "an agreement in which she had no role." Urging that the jurisdiction of a temporary judge, circumscribed by the stipulation, is limited to matters that are "a continuation of the stipulated cause or question its finality, such as motions to vacate or reconsider" and not to "ancillary" matters "heard on a separate record" and seeking "an independent judgment or reviewable order" (*Orange County Dept. of Child Support Services v. Superior Court* (2005) 129 Cal.App.4th 798, 807), Tracy maintained that Jose's motion to enforce the MOA was ancillary because Perkovich had no role in negotiating, drafting, or approving it.[41]

The dissent views Tracy's assertions in the prior writ petition that Perkovich had " 'no nexus' " to the MOA as incompatible with Tracy's present claim that she entered the MOA due to duress caused by Perkovich's rulings. But saying Perkovich played no part in the negotiations, drafting, or approval of the MOA is a far cry from saying that Tracy's

---

[41] The dissent quotes Tracy's statement that the MOA " 'is not the result of a ruling or order of attorney Perkovich, and she did not sign it. She had no role in its preparation or execution. The MOA was negotiated by lawyers working in the office of Jose's counsel. It was signed initially by Tracy at her private residence and later by her at her family law attorney's office. [¶] . . . [¶] [Perkovich's] role as a judicial officer was *not in play* in the MOA. Her imprimatur was not necessary for it to have effect. [¶] . . . [¶] [Perkovich] has no nexus with the MOA Tracy and Jose executed.' "

50

evaluation of and reasons for signing the MOA were not influenced by rulings Perkovich had previously issued. Tracy's argument in the prior writ petition—that Perkovich did not participate in the development or execution of the MOA, and enforcement of the MOA exceeded the scope of her stipulated appointment—addresses a completely different point from, and is not inconsistent with, Tracy's present argument that Perkovich's rulings had a psychological effect on Tracy and influenced her evaluation of and decision to enter the MOA.

Jose's view is that the enforceability of the MOA has nothing to do with Perkovich's "technical noncompliance" with the disclosure requirements, her disqualification, or the voidness of her orders, but rather presents "a question of fact for the trial court to determine" as part of its determination of Jose's motion to enforce the MOA under section 664.6. The "question of fact" Jose posits is whether Tracy can establish her claim that she signed the document under economic duress; he emphasizes that this claim is now "only a yet-to-be-proven allegation in a declaration that has yet to be subjected to discovery or cross-examination."

Jose's argument is based on the status of his motion to enforce the MOA *at the time it was presented to Perkovich*. As we have explained, at that time Tracy and her counsel were unaware of Perkovich's noncompliance with canon 6D(5)(a), and Tracy's opposition to enforcement of the MOA was based solely on her claims that she signed the document under economic duress and that the parties had not served on one another or mutually waived the final financial declarations required by Family Code section 2105 prior to signing the MOA. By the time the issue of enforcing the MOA was presented to Judge Price, Tracy and her counsel had learned of Perkovich's failure to disclose "in writing or on the record" and successfully obtained her disqualification. The disqualification of Perkovich dramatically changed the focus of the motion to enforce the MOA: The question was no longer whether Tracy signed the MOA under duress but whether Perkovich's void orders so influenced the MOA that it is "tainted" and unenforceable.

*Rossco Holdings, supra,* 149 Cal.App.4th 1353, is instructive on the manner in which the acts of a disqualified judge may taint subsequent proceedings. As earlier described, the

51

trial judge in the case disqualified himself after issuing an order compelling arbitration. The newly assigned judge vacated not only the order compelling arbitration, but also the subsequent arbitration award. While affirming that the disqualified judge's order compelling arbitration was void, the reviewing court reversed the order vacating the arbitration award as premature because the award was not necessarily improper: Since the basis for the order compelling arbitration was a contractual arbitration clause, if the clause governed the parties' dispute, they would be required to arbitrate independently of the judge's void order. (*Rossco Holdings*, at p. 1365.) In that case, the arbitration award should be vacated only if the trial court determined that the arbitration was tainted by the disqualified judge, or should be vacated on other grounds. (*Id.* at p. 1367.) *Rossco Holdings* described the appropriate standard for determining whether the arbitration was tainted as "whether '[a] person aware of the facts might reasonably entertain a doubt that the [arbitrators] would be able to be impartial.' " (*Ibid.*)

While *Rossco Holdings* was concerned with the effect of a void order compelling arbitration on the arbitrators deciding the merits of the case, and the question here is the effect of void court orders on the parties' own decisions whether to accept the terms of a settlement, the policy considerations are the same. In explaining why the disqualification of the judge who issued the order compelling arbitration did not require invalidation of the arbitration award absent a determination that the arbitration proceedings were tainted, the *Rossco Holdings* court pointed out that "the policy behind judicial disqualification is not thwarted by allowing an untainted arbitration to stand. 'Statutes governing disqualification for cause are intended to ensure public confidence in the judiciary and to protect the right of the litigants to a fair and impartial adjudicator.' [Citation.] Public confidence in the judiciary is not undermined by allowing an untainted arbitration to stand. To the contrary, public confidence . . . would be undermined if the court threw out an arbitration award issued by fair and impartial arbitrators, thereby requiring a second arbitration, simply because the judge who initially granted the motion to compel arbitration should not have ruled on the motion." (*Rossco Holdings*, *supra*, 149 Cal.App.4th at p. 1365.)

52

Similarly, here, enforcement of a marital settlement agreement that was *not* influenced by void orders of a disqualified judge would not undermine the policy behind judicial disqualification, and public confidence in the judiciary would be undermined if such an independent agreement was not enforced. But the contrary is also clearly true: Enforcement of an agreement that *was* influenced by the void rulings of a disqualified judge would both undermine the policy of judicial disqualification and cast doubt on the impartiality of, and therefore public confidence in, the courts.

It warrants reiteration that the legal correctness of the void rulings is irrelevant, as is the question whether Tracy signed the MOA under economic distress as she originally claimed. The relevant inquiry is whether Perkovich's void rulings influenced the parties' assessment of the strengths of their respective cases and therefore their willingness to accept terms of the settlement. Adapting the standard described in *Rossco Holdings* to the present question, the appropriate standard is whether a person aware of the facts might reasonably entertain a doubt that, in the absence of the void rulings, the parties would have agreed to the terms of the MOA.

It is virtually a truism that parties considering settlement after a lengthy period of litigation take into consideration the court's rulings to that point; those rulings tell the parties where they stand on whatever issues have been determined, providing some basis for assessing the strengths and weaknesses of their respective cases and anticipating the outcome of further rulings. While there may well be cases litigated as long as this one was in which the rulings of the judge or temporary judge did not affect the parties' settlement, this case is not one of them. As *Rossco* indicates, if there is doubt about the effect of a disqualified judge's conduct, the issue of taint presents a factual, not a legal, issue. There can be no such doubt in this case.

After initially pursuing dissolution proceedings in superior court in April 2012, the parties submitted their dispute to a private judge who presided over multiple settlement conferences and hearings. Perkovich's rulings were almost all in Jose's favor. That Tracy and her counsel perceived Perkovich as favoring Jose and Blevans is evident from Tracy's two attempts to withdraw from the stipulation appointing before finally seeking

53

disqualification. Tracy signed the MOA the day before the hearing at which Perkovich was to rule on Jose's motion to transfer control of Tracy's company to Jose or a receiver, threatening Tracy with the potential loss of any say in the running of the company she had founded.

Might a person aware of these facts reasonably entertain a doubt whether Tracy would have signed the MOA in the absence of Perkovich's rulings? To ask the question is to answer it: Even if she did not sign the MOA under economic duress, how could she *not* have taken into consideration the orders that had been issued in the case and what they led her to expect from the highly consequential hearing the next day? It would be a waste of judicial resources to remand this case to inquire whether this was in fact the case. As *Rossco Holdings* points out, judicial economy "is a factor properly considered in cases of judicial disqualification. (*Rossco Holdings*, *supra,* 149 Cal.App.4th at p. 1365, fn. 20.) We conclude as a matter of law that the MOA cannot be enforced under section 664.6, because the effectuation of a settlement tainted by the void rulings of a disqualified temporary judge would undermine public confidence in the judiciary and the right of litigants to fair and impartial adjudication.

## III.

### *Judge Price's Rulings*

Tracy urges that Judge Price should also be disqualified, and her orders vacated, because she was familiar with Perkovich's "anti-Tracy" arguments before she began to rule in the case and because she analyzed privileged communications between Tracy and her attorneys in camera. Tracy emphasizes Perkovich's letter expressing fear of Tracy and her participation in this case after being disqualified, in violation of Judge Stone's order; she characterizes Perkovich's motion for declaratory relief concerning fees as "portray[ing] Tracy and her attorneys in a bad light, while advocating for Blevans and his client." Tracy views Perkovich as having violated canon 3(B)(7)(a), which prohibits a judge who knows she is disqualified from hearing a case and from discussing the matter with the judge assigned to the case.

54

Even accepting the inappropriateness of Perkovich's conduct, we have no basis for concluding it tainted the proceedings to the extent of interfering with Judge Price's ability to maintain impartiality. Perkovich's motion for declaratory relief portrayed the facts in a self-serving light, but it did not expressly cast aspersions on Tracy or her attorneys. The motion and supporting declaration stated that Perkovich had acted in accordance with the stipulation and order appointing her and was entitled to be paid for the services she rendered, pointing out that Tracy's first two attempts to disqualify her had been denied and characterizing her eventual disqualification as having resulted from her "request for recusal" in response to Tracy's claim of bias. She stated that Judge Stone's order denied Tracy's "request for a finding that I acted beyond the authority granted by the Stipulation and Order to Appoint Judge Pro Tem." Perkovich's letter to Judge Stone was considerably more inflammatory, referring to concern for her "personal safety" due to Tracy's "increasingly hostile" behavior and "angry outbursts." But this does not mean Judge Price was influenced by Perkovich's injudicious comments.

" 'A trial judge hears many items during the course of a trial which are inadmissible, and [s]he is called upon to rule on the admissibility of numerous evidentiary matters. The fact that [s]he has heard these things does not mean that [s]he cannot divorce them from [her] mind.' " (*People v. Beaumaster*[, *supra,*] 17 Cal.App.3d [at p. 1009], quoted in *In re Richard W.* [(1979)] 91 Cal.App.3d [960,] 968 [both cases involving a court trial].)" (*Scott, supra,* 15 Cal.4th at p. 1206.) " 'As an aspect of the presumption that judicial duty is properly performed [(Evid. Code, § 664)], we presume . . . that the court knows and applies the correct statutory and case law [citation] and is able to distinguish admissible from inadmissible evidence, relevant from irrelevant facts, and to recognize those facts which properly may be considered in the judicial decisionmaking process.' (*People v. Coddington* (2000) 23 Cal.4th 529, 644.) Stated another way, a trial court is presumed to ignore material it knows is incompetent, irrelevant, or inadmissible." (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1526.) "Only proof that the evidence actually figured in the court's decision will overcome these presumptions. [Citations.] Clearly, the mere fact that the court heard or read the evidence is not sufficient to overcome the presumptions." (*Ibid.*)

When Judge Price entered the case, it was clear that relations between Perkovich and Tracy had soured irredeemably; Perkovich's letter was obviously not written from an impartial perspective. This had to have been clear to Judge Price. We presume Judge Price viewed the letter in proper context and did not allow it to influence her view of the parties' positions and legal arguments.

Judge Price stated at a hearing regarding reopening discovery, " 'I read Perkovich's [letter]. And it generally said that anything she decided would never be satisfactory to petitioner and so she was asking to be relieved.' " Pointing to this statement and noting that Judge Price did not mention Perkovich's "numerous ethical violations, the disqualifying conflicts that led to the motion to disqualify, the favor Perkovich had done to help Blevans defeat a motion that was pending before Judge Stone, or even Perkovich's highly inappropriate (and probably false) suggestion that she suddenly perceived Tracy as a physical threat," Tracy states that Perkovich "successfully poisoned the new judge against the party who had called for disqualification" in violation of the Canons of Judicial Ethics.

We will not assume, as Tracy seems to, that Judge Price's comment at the hearing reflects her acceptance of Perkovich's view of Tracy or of the disqualification. In an aside not directly relevant to the issue actually being discussed, Blevans asked the court to "[r]emember" that Tracy had had "a desperate desire" to no longer have Perkovich on the case and "ultimately succeeded in having [Perkovich] say, 'I don't want this case either.' " When Tracy's attorney interjected that this was a misstatement of facts and evidence, Judge Price made the statement quoted above. Her description of the "gist" of Perkovich's letter was correct, and the circumstances did not call for any further comment on Tracy's allegations or the import of the disqualification.

Furthermore, Perkovich's letter to Judge Stone, as well as her motion for declaratory relief, is a part of the record in this case, available to any judge who presides over it in the future. Any future judge will be placed in the same position as Judge Price, having to ignore Perkovich's negative comments about Tracy. We presume their ability to do so.

Aside from seeking to have Judge Price's orders vacated as a consequence of her asserted disqualification, Tracy asks us to reverse Judge Price's sanctions orders on the

56

merits.  All the sanctions orders related to discovery relevant to the question of enforceability of the MOA.  In ordering the $36,000 in sanctions, Judge Price found that it was unreasonable for Tracy to think the door to discovery was not opened by her claim that she signed the MOA without understanding what she was signing and in reliance upon her attorney's statements or failures to act, and Tracy therefore had no substantial justification for opposing Jose's motions to reopen discovery related to enforcement of the MOA and to compel documents (aside from certain attorney billing records), or for moving to quash the subpoenas issued to Tracy and to Jackson (with the same exception).  The final sanctions order was imposed because Judge Price found Tracy had no substantial justification for opposing Jose's motion to clarify, which sought to broaden the scope of discovery related to enforcement of the MOA to include all settlement negotiations and not just those the few days surrounding the date the MOA was signed.  Judge Price noted that when the motion to reopen discovery was first heard, no one argued the time frame of the discovery request or argued negotiations had extended over months before the date of execution; the judge knew only that the MOA was executed in January 2014 and "had no idea what the background was."

In light of our decisions that Perkovich's orders were void and that the MOA is unenforceable, Judge Price's decision to postpone resolution of Tracy's motion to set aside Perkovich's orders and proceed with discovery related to enforcement of the MOA was misguided; the discovery that Judge Price ordered to proceed, and sanctioned Tracy for opposing, was unnecessary and is now moot.  But the question is whether the sanctions orders were within Judge Price's discretion at the time she made them.  Tracy's arguments in this regard are not convincing.  She maintains that the $36,000 sanctions order resulted from motions pertaining to "remnants of Perkovich's actions that never should have occurred in the first place."  Perkovich did not issue any orders relevant to the motion to enforce the MOA. The discovery motions Tracy opposed pertained to "remnants of Perkovich's actions" in the sense that those actions were the basis of Tracy's successful argument in this court that her decision to sign the MOA was influenced by Perkovich's orders and conduct.  But this was not the posture of the case before Judge Price.  Tracy was opposing Jose's motion to enforce

57

the MOA by arguing that she signed it under duress caused by Perkovich's rulings and conduct, and Jackson's advice, and we can find no fault in Judge Price's determination that Tracy's argument opened the door to discovery related to the parties' negotiation of the MOA. Tracy argues that the additional order for $6,000 in sanctions imposed on April 13, 2015, was unreasonably based on the fact that in opposing Jose's motion to clarify Judge Price's prior discovery order, Tracy argued that the order was correct and clear. The point of Jose's motion, however, was that the entire history of negotiations was relevant, not just the few days in January when the final version of the MOA was negotiated and executed. Judge Price viewed Tracy as having no substantial justification for insisting that discovery should be limited to those few days. We see no abuse of discretion.

Further, even if Judge Price had properly considered Tracy's motion to vacate Perkovich's orders before considering the discovery issues, the discovery issues would have remained when the judge turned to Jose's motion to enforce the MOA. Our conclusion that we can, and should, decide the enforceability issue as a matter of law in the interest of judicial economy does not mean Judge Price necessarily should have done so. No party had asked her to do so; indeed, even in her initial brief in support of her petition to this court, Tracy asked us to order the trial court to address the "invalidity" of the MOA.

## DISPOSITION

The petition is granted.

The orders entered by Perkovich are void and must be vacated.

The matter is remanded to the Napa County Superior Court for proceedings consistent with the views expressed herein, including resolving the parties' respective rights and obligations created by vacation of the orders, most of which pertained to matters bearing upon spousal support and attorney and expert witness fees.

_____
Kline, P.J.

I concur:

_____
Stewart, J.

58

Richman, J., dissenting.

In February 2011, Tracy Hayward filed a petition to dissolve her marriage; in April, Jose Osuch filed his response. In early 2012, the parties and their attorneys signed a stipulation that Sacramento attorney Nancy Perkovich be appointed a private judge to handle the matter, an appointment approved by the Napa Superior Court in April 2012. Perkovich presided over hearings and issued orders, including orders that transferred monies between the parties. Perkovich's last involvement was in 2013, probably October. Meanwhile, without any involvement by Perkovich, the parties engaged in five months of settlement negotiations, culminating in a January 2014 "Memorandum of Understanding" (MOA) signed by the parties and their attorneys. On May 20, 2014, Jose filed a motion to enforce the MOA. Ten days later a new attorney entered the picture.

On May 30, 2014, Tracy's current attorney—her fourth— substituted in, and began what can only be described as a vituperative attack on Perkovich, on Jose's attorney—indeed, on the very concept of private judging. It began with a motion to withdraw the stipulation and remove Perkovich, based on her claimed failure to make a certification. The trial court denied the motion. Tracy sought a writ. We denied it. The Supreme Court denied review.

On October 7, 2014, Tracy filed the petition before us here, asserting for the first time two new grounds for removing Perkovich, two grounds of claimed disqualification never before urged, and based on claimed facts that had been known for over a year, some for almost two. Despite that history, despite that timing, the majority wholeheartedly agrees with Tracy, in an opinion that for some reason views every fact and interprets every circumstance in favor of Tracy—an approach that, as a close reading of the majority will reveal, sometimes results in the majority engaging in a lengthy explanation or justification, and other times in simply dismissing any contrary reading.

Based on that approach, the majority holds that disqualification occurred when Perkovich did not comply with Canon 6D of the Code of Judicial Ethics requiring disclosures either "in writing or on the record" when she presided over her first session with the parties, on October 30, 2012. The majority also holds that Perkovich's response

1

to Tracy's petition was not a "written, verified answer," and Perkovich was thus "deemed to have consented to the disqualification," which in turn resulted in "an admission of the truth of its allegations."

The majority also holds that all of Perkovich's orders are void, a holding that necessarily requires disgorgement of all the monies that Perkovich caused to be transferred, doing so without any guidance or direction to the trial court as to how to accomplish that disgorgement.

Finally, the majority goes so far as to hold that as a matter of law the MOA "was tainted" by Perkovich's orders and is "therefore unenforceable." This holding is notwithstanding that the MOA followed five months of negotiations in which Perkovich had no involvement—and notwithstanding that "taint" is a question of fact.

I cannot agree with any of that, and I dissent.

As will be discussed, I have a much different view of the salient facts here, facts not mentioned by the majority, that lead me to disagree with the majority's conclusions as to the law of disqualification. Moreover, the majority disregards that the petition before us here, filed on October 7, 2014—24 months after the first claimed disqualifying circumstance and 12 months after the second—is in abject violation of Code of Civil Procedure, section 170.3 (c)(1), which requires that Tracy must move "at the earliest practicable opportunity" after the facts of disqualification become known. Put otherwise, even if there were a proper basis for disqualification—which there was not—it was waived. Not to mention time barred.

**The Pertinent Facts As I See Them**

Presiding Justice Kline's majority opinion contains a 23-page statement of "Facts and Proceedings Below," an extensive recitation to be sure. But there are other facts pertinent to all that transpired here, and I begin with those background facts.

On February 16, 2011, Tracy filed in Napa County a petition to dissolve marriage. She was represented by Napa attorney Roger Lewis.

On April 1, 2011, Jose filed his response, represented by Napa attorney Robert Blevans.

2

Various proceedings were held before Napa County Superior Court judges, in at least one of which Tracy was sanctioned. And at a case management conference on January 9, 2012, the case was set for trial on May 21, 2012. Eleven days later, on January 20, attorney Lewis substituted out. Tracy was now in propria persona.

Sometime later, apparently in late March, Blevans received a communication from attorney John Munsill, of Gold River, Sacramento County. Munsill advised that he had been asked to substitute in as attorney for Tracy, and was considering it, but would only do so if Blevans would agree to have the matter dropped from the calendar and presided over by a private judge, Nancy Perkovich, a Sacramento attorney who specialized in family law. Blevans, who knew Perkovich from previous relationships, on behalf of Jose agreed.

In late March 2012 a comprehensive five-page "Stipulation and Order" (Stipulation) was prepared, drafted by Munsill. The Stipulation was signed on March 28 by Tracy, Jose, Munsill, and Blevans. On March 29, Perkovich signed the oath at the end of the Stipulation. On April 3, Presiding Judge Stone of the Napa County Superior Court signed this Order: "Pursuant to Rule 2.830 et seq. of the California Rules of Court, the foregoing selection of Nancy Perkovich, Esq. as Temporary ('Private') Judge in the above-titled cause is hereby approved, and said attorney is so designated and assigned. In addition, all other terms set forth in the above Stipulation and Order are hereby so ordered." On April 5, the Stipulation was filed with the court.

The Stipulation began with a 10-line recital of the broad powers given to Perkovich. Paragraph 4 of the Stipulation recited that "Both parties waive the Clerk's minutes." The Stipulation went on to include orders vacating the trial date and deferring discovery, apparently done with an eye toward possible resolution.

The first session before Perkovich was not until October 30, 2012, held in her office in Sacramento, a settlement conference. Those in attendance included Tracy and her attorney Munsill; Jose and his attorney Blevans; and two accountants, David Schultze on behalf of Tracy, and Darlene Elmore on behalf of Jose. There is no dispute that at the session Perkovich made oral disclosures about her prior relationships with Munsill and

3

Blevans. As the majority describes it, Perkovich has represented that she told all present " 'about my professional contacts with each attorney including the fact that (1) I had been hired once before as a judge pro tem in a case where Mr. Blevans was an attorney, (2) Mr. Blevans was hired as a judge pro tem once in a case where I was an attorney, (3) Mr. Munsill was hired as a judge pro tem once in a case where I was an attorney, (4) I was hired as a settlement judge once in a case where Mr. Munsill was an attorney, (5) Mr. Munsill and I had been previously associated as counsel on a case, (6) I served on the Sacramento Family Law Bar Association Committee with John Munsill and socialized once with he and his wife and children related to that professional organization, and (7) I am a member of the American Academy of Matrimonial Lawyers and was acquainted with Mr. Blevans from that organization. I also disclosed that I had hired David Schultze, CPA many times on cases throughout my career and had also had him as an opposing expert on many cases. I had not previously met Darlene Elmore, CPA. I asked all parties and attorneys if they were comfortable with my acting as judge pro tem. All parties indicated that they wished me to proceed in that capacity.' " Indeed they did.

As the majority also acknowledges, "Blevans, Elmore, and Schultze all stated in declarations or deposition testimony . . . that Ms. Perkovich . . . disclosed her prior contacts with Blevans and with Munsill at the October 2012 meeting, including that she and each of the attorneys had acted as temporary judge in each others' cases, and that the parties agreed to proceed with Ms. Perkovich as temporary judge. . . . [¶] Munsill testified at a deposition in February 2015 that he recalled Ms. Perkovich discussing at the settlement conference 'her various prior connections with both [Blevans] and me,' but did not recall 'the details' of that discussion. He did not recall Tracy expressing concerns about Ms. Perkovich's disclosures. Munsill acknowledged that he had a 'mutual judging relationship with Ms. Perkovich, each having served as judge in a case where the other represented a party. Munsill stated that he had no reason to believe inaccurate the statement in Blevan's declaration that after Ms. Perkovich's disclosures at the settlement conference, 'both counsel and the parties acknowledged their understanding and agreement to move forward with Judge Pro Tem Perkovich presiding.' He did not recall

4

presenting Tracy with a written waiver of any potential conflict after Ms. Perkovich disclosed her professional relationships with the two attorneys and stated, 'I don't recall there being a need for that.' "

The register of actions reflects one uneventful entry after October 30, 2012, on December 12. The next two entries, on March 26 and April 19, 2013, are substitutions of attorneys. Under the first, Munsill was out, and Tracy was again in propria persona. Under the second, Trevor Jackson, an attorney in Napa, substituted in.

Over the ensuing months various hearings were held before Perkovich. A "Summary of Hearings, Conferences and Orders" prepared by Perkovich—which is not disputed by either Tracy or Jose—shows that there were seven telephonic case management conferences (on November 2 and 20, 2012, February 11, March 4, April 26, June 3 and 13, 2013) before a case management order was filed on September 10, 2013, and another telephonic conference on November 18, 2013 before a second case management order was filed on December 16, 2013. There were two actual hearings (on July 30, 2013 and a "long cause hearing" on October 9, 2013) and a telephonic hearing "re Claim of Exemption" on October 24, 2013. And, of course, Perkovich made the various orders Tracy seeks to void here.

Meanwhile, settlement negotiations resumed, without any Perkovich involvement, which negotiations continued over many months. They began with a conference in June 2013, a few months after Jackson substituted into the case. In July Tracy extended two proposals, and Jose responded in an August 9 letter, where he proposed a "complete and global resolution," the terms of which included that Tracy pay Jose $300,000 to equalize the award to Tracy of the parties' residence; $2,500,000 to equalize the community interest in the companies; and spousal support of $25,000 per month until Jose's death, remarriage or further court order. As the majority puts it, "Blevans . . . described [this proposal] as having become the 'foundation' for the Memorandum of Agreement (MOA) the parties eventually signed."

While those settlement negotiations continued, on November 7, 2013 Jose filed a "Request for Control and Management of PPNV or in the Alternative for Appointment of

A Receiver," set for hearing on January 14, 2014. The basis of Jose's motion was that Tracy had engaged in various shenanigans vis-a-vis the business, to Jose's detriment. As Jose's counsel represented to the court below, the complained-of conduct includes Tracy's "actions in terminating her salary so that [Jose] would not be paid. It includes the court's finding that she took $600,000 in excess distribution from the company at a time when she was saying the company was in precarious financial condition, paid out $270,000 for her own personal litigation expenses, shipped off $30,000 to Grand Cayman, turned over control of the company to Howell Bennett and Stan Blyth who then attempted a corporate takeover."

Meanwhile, settlement negotiations continued. On November 25, Tracy proposed a settlement providing for payments of $300,000 for the residence, $2,000,000 for the companies, and $10,000 monthly spousal support for Jose's life, regardless of remarriage. On December 4, Blevans, Tracy, Jackson, and Tracy's business attorneys Ian Carter and Eric Jeppson attended an all-day settlement conference, which was adjourned in order to provide Jose time to prepare a disclosure statement regarding foreign bank accounts. After the disclosure was made, discussions resumed at a December 23 meeting attended by Blevans, Jackson, Carter and Jeppson. Through these three attorneys, Blevans says, Tracy proposed a $2.5 million equalizing payment and spousal support of $18,000 per month, to be reduced to $16,500 per month after six years and terminated after eleven years. Jose's counter-proposal specified payment of $300,000 for the residence, $2.5 million for the companies, and spousal support of $25,000 per month, non-modifiable until Tracy paid the $2.5 million in full.

On January 10, 2014, Blevans met with Jeppson and Carter to discuss how Tracy would structure the payments Jose had agreed to accept at the December 23 meeting, and Blevans agreed to the equalizing payment being reduced to $2.4 million. And on that day the MOA was signed.

On May 20, 2014, Jose filed a motion to enforce the MOA. Ten days later, another substitution of attorneys was filed. Jackson was out, and Tracy was now

6

represented by her fourth attorney, Keith Dolnick of Irvine (apparently later to be associated with David Ezra, also of Irvine).

With that, the litigation took off, the upshot of which is the last 25 pages in the register of actions. But the litigation did not just increase in quantity, but in intensity, with Tracy's papers reflecting a tone that can only be called intemperate. Below, and here, Tracy filed papers riddled with vituperation, filled with attacks on the very system of private judging, not to mention ad hominem attacks on Perkovich and Blevans, attorneys I understand to be reputable members of the American Academy of Matrimonial Lawyers. Jose's briefs implore us to disregard what he claims are the unsupported attacks manifest in Tracy's briefs. For sure.[1]

---

[1] Here are a few quotations from the briefs:

• "No California litigant should ever have to wonder whether the paid private judge they entrusted with their case is corrupt and aligned with the other side's attorney."

• "The relationship between Mr. Blevans and Ms. Perkovich has cast a pall over this case. The thought that a system could be manipulated to the point that a 'settlement' could be obtained by threatening to have a private judge who was subject to disqualification take away a litigant's company and her livelihood unless millions of dollars were forfeited via 'settlement' is stomach turning."

• "Instead, these attorneys and experts had worked together and side-stepped ethical requirements so often, that they never even considered complying with the Canons of Judicial Ethics by making on the record disclosures. Nor did they ever consider requesting a proper signed, written waiver they could file with the court. [¶] "If a litigant caught on and protested, these family law attorneys planned to circle the wagons and try to blame the litigant."

• "Apparently, attorneys and experts who all know each other and work together on case after case, get in a room or call each other's cell phones, and they collectively decide what is going to happen and how the litigants' money will be doled out to the involved professionals. [¶] Attorneys who are socially and professionally connected to the experts and other attorneys in the case, acting as paid judges for their friends, is bad enough. But where the 'judging' relationship is *mutual*, there is a strong temptation for attorneys who act as 'paid private judges' to engage in unethical and inappropriate 'you scratch by back; I'll scratch yours' behavior."

• "However, by systematically 'relaxing' these ethical rules, small groups of family law attorneys can dominate their local markets, knowing reciprocity will ensure ample attorney's fee awards and outcomes that financially benefit the attorneys who hire

Regardless, with briefs riddled with such invective, Tracy's lawyers set out to undo all that had transpired: to have Perkovich disqualified, to have her orders declared void—indeed, to have the MOA held invalid because it was signed against the background of Perkovich's rulings, which, in the words of Tracy's attorneys, "created the ultimate duress."[2]

The majority agrees on all counts. I agree on none. The law does not support disqualification. But even if it did, Tracy's motion was untimely. And I do not understand how the majority can decide duress, ultimate or otherwise, as a matter of law. Duress is an issue of fact. (*Kravitz v. BT Visual Images* (2001) 89 Cal.App.4th 164, 176.)

## DISCUSSION

### Private Judges

Article 6, Section 21 of the California Constitution provides that "On stipulation of the parties litigant the court may order a cause to be tried by a temporary judge who is a member of the State bar, sworn and empowered to act until final determination of the cause." As described in *Marriage of Assami* (1994) 7 Cal.4th 896, 907–908: "California has created a full-fledged system of private judges, colloquially 'rent-a-judge,' which

_____

their friends as judges. [¶] "This routinized departure from the ethical rules helps ensure that money will be free-flowing for the attorneys and experts—handed out by a 'judge' who, in reality, is a friend they can count on."

[2] Hyperbole by attorneys is one thing. Disingenuousness is another. And I am particularly concerned by the 180-degree change of position manifest by the belated claim of duress here, in light of the express concession of Tracy and her attorneys in their writ petition to this court. There, in arguing that Perkovich should not be the one to enforce the MOA, they made these representations: "The MOA is not the result of a ruling or order of attorney Perkovich, and she did not sign it. She had no role in its preparation or execution. The MOA was negotiated by lawyers working in the office of Jose's counsel. It was signed initially by Tracy at her private residence and later by her at her family law attorney's office. [¶] . . . [¶] [Perkovich's] role as a judicial officer was *not in play* in the MOA. Her imprimatur was not necessary for it to have effect. [¶] . . . [¶] Nancy Perkovich has no nexus with the MOA Tracy and Jose executed."

I do not understand such a blatant change of position to be ethical advocacy. And the majority's labored effort to explain this away in a two-page discussion of "ancillary" matters does not convince me otherwise.

8

permits the parties to agree to a temporary judge. . . . Such an agreement allows the parties to bypass urban courts' crowded calendars, obtain a trial on a certain, prearranged date convenient to the parties and witnesses, and avoid the cost of trailing on a master calendar while waiting for a courtroom."

Recognizing the propriety of private judging, the majority, however obliquely, casts a skeptical eye on it, especially in the family law setting, suggesting it needs some special oversight there, apparently because the participants are familiar with one another.

I see it differently, and perhaps especially in the family law area, for reasons described, for example, by retired Superior Court Family Law Commissioner Jill S. Robbins: "Unlike public judges, private judges are selected by the parties. One tremendous advantage of private judging is that it allows counsel to ensure that the judicial officer has experience in the relevant substantive area of law involved. Family law, for example, has become so sophisticated that the attorney must have a working knowledge of juvenile dependency, bankruptcy, general corporate formation, business transactions and valuation techniques, cash flow analysis, security and enforcement methodology for future payments, and behavioral sciences, to name a few. This knowledge, of course, is in addition to the substantive area of family law and all its intricacies. Some family law judges never practiced family law before their appointment. Accordingly, the selection of a private judge with expertise in the applicable area or areas provides a significant advantage, not only in reducing 'education time' but in providing the attorney and client with the certainty that the private judge will understand the evidence presented." (Robbins, "The Private Judge: California Anomaly or Wave of the Future.")

As the law review article cited by the majority sums up: "private judges will likely have had years of experience . . . adjudicating family disputes. Parties can select a mutually agreeable private judge who has specialized knowledge of the relevant area of family law, such as . . . property division, or alimony. . . . [¶] . . . Given that divorce . . . battles can drag on . . . to the detriment of all . . . involved, speed and efficiency are invaluable." (Nagaraj, *The Marriage of Family Law and Private Judging in California*

9

(2007) 116 Yale L.J. 1615, 1618, 1619; see Judicial Council of Cal., *Report and Recommendations of the Judicial Council Advisory Committee on Private Judges* (1990) pp. 14–15.) In sum, not only do private judges provide expediency, but perhaps most important of all they provide the parties and their counsel an expert to preside over the dispute, someone counsel knows, and for whom he or she has respect. And trusts.

Whether these reputed virtues of a private judge are real is not at issue. What is relevant is that Tracy and Jose elected the procedure.

## There is No Basis for Disqualification

### *Introduction to the Issue*

The majority begins its substantive discussion as follows: "Tracy's motion to disqualify was based on Ms. Perkovich's alleged violation of Canon 6D by failing to disclose her personal or professional relationships with Blevans, 'in writing or on the record' and failure to obtain the parties' written waiver to disqualification on that ground and file it with the record as required by section 170.3, subdivision (b)(1). The motion to disqualify was also based upon the claim that Ms. Perkovich's conduct during the proceedings over which she presided demonstrated that she was actually biased and prejudiced against Tracy. Tracy maintains that a person aware of the facts Ms. Perkovich declined to disclose in writing or on the record, and/or her biased conduct during the proceedings, 'might reasonably entertain a doubt that [Perkovich] would be able to be impartial.' (Canon 6D(3)(a)(vii)(C), § 170.1, subd. (a)(6)(A)(iii).)"

Tracy's petition in support of disqualification devoted the bulk of its argument, more than two-thirds, to the first claim of disqualification, the claimed noncompliance with Canon 6D. Similarly, the oral arguments here focused almost exclusively on the Canon. Despite that, the majority essentially disregards that claim, to the point that it is virtually ignored.

So despite Tracy's focus and emphasis, and despite her argument, I will address the issues in the same order as the majority.

10

*Code of Civil Procedure section 170.3 Does Not Support Disqualification.*

The majority focuses on Tracy's second basis for disqualification and holds that because Perkovich did not " 'file a written verified answer admitting or denying' " the allegations in Tracy's statement, she was "deemed to have consented to . . . her disqualification." And, the majority concludes, "That determination treats the judge's failure to file a response to the statement of disqualification as an admission of the truth of its allegations . . . ."

This holding, I submit, is not supported here. Worse, it is flatly contrary to Presiding Judge Stone's order below.

Before turning to a demonstration of why, I begin with the observation that the majority's conclusion shows no appreciation for the realities of the situation, no consideration for what I understand, anecdotally at least, to be the real life facts facing trial judges. Specifically:

I understand that the standing order in many superior courts is that a judge who receives a challenge is to immediately advise his or her presiding judge. And I understand that the challenged judge is put in contact with someone at the Judicial Council, which provides assistance, usually in the form of a lawyer to advise and assist the judge in how to respond. Put simply, a challenge to a judge is a most significant, yet infrequent, occurrence, one requiring expert help and guidance, help the court system provides. Thus, for example, there are at least two publications by the Judicial Council addressing the subject: (1) California Judges Bench Guide: Disqualification of Judge; and (2) Disqualification and Disclosure. [3] There is also a video to assist judges in dealing

---

[3] The introduction to "Disqualification and Disclosure," described as a "Compilation of Advice From the Ethics Committee of the California Judges Association and Discipline by the Commission on Judicial Performance," nicely synthesizes the situation:

"INTRODUCTION

"This paper addresses the problems facing judges in recognizing situations and cases in their court assignments that mandate disclosure and potential disqualification. Judges are required by statute (CCP § 170) and the canons (Code of Judicial Ethics

11

with judicial challenges: http://www2.courtinfo.ca.gov/cjer/judicial/1715.htm. And a Serranus web site.

Perkovich, of course, had access to none of that assistance. So, acting on her own, in response to Tracy's request for disqualification Perkovich prepared a letter to Presiding Judge Stone that was hand delivered to the court and filed on November 7, 2014. That letter provided in its entirety as follows:

"Dear Judge Stone,

"I would like to recuse myself from the case of Marriage of Hayward & Osuch. The Petitioner, Tracy Hayward, filed a motion for disqualification on the grounds of bias on October 7, 2014. She alleges that I have a financial interest in the proceedings because I am paid for my work pursuant to the stipulation of the parties appointing me as the Judge Pro Tempore. She further claims a bias in favor of Mr. Blevans because Mr. Blevans has acted as a private settlement judge on one case where I was associated as counsel and because I have been hired on two cases where he was an attorney. I also had the same mutual judging relationship with two of Ms. Hayward's previous attorneys, Roger Lewis and John Munsill. I disagree that these professional relationships constitute bias. The California Rules of Court, Rule 2.830, et. seq. specifically allows for retention of private judges. The Petitioner consented to my retention. She did so after disclosure from me at our first case management meeting about the details of my professional relationship with both Mr. Munsill and Mr. Blevans.

_____

Canon 3B(1)) to hear and decide all matters in which they are not disqualified, and they may be disciplined for improper recusal [citation]. At the same time, they are required to adhere diligently to the statutes governing disqualification (CCP §§ 170.1 et seq.) . . . . However, in determining the propriety of presiding in matters which contain factors that overlap on the remainder of their personal and professional lives, judges are frequently confronted with questions that cannot be resolved by simple reference to the codes and the canons.

"The California Judges Association provides a hot line service with immediate member access to a judge serving on the Committee on Judicial Ethics. The presented problem is analyzed, and informal advice is rendered . . . .

"This paper focuses on disqualification and disclosure problems . . . ." [p. 1]

12

"I have, however, become concerned about my personal safety in this case due to Ms. Hayward's conduct. Her behavior has become increasingly hostile with angry outbursts to the point that I am fearful of her. It is also evident from Ms. Hayward's ongoing violations of the existing court orders that she will never accept anything I decide. I therefore feel that I am an impediment to resolution of the parties' case, which is not desirable. It is for these reasons that I request a recusal."

The effect of this, the majority concludes, is the "admission of the truth of its allegations."

The Supreme Court has held that although the disqualification statute refers to a written, verified answer, a written declaration under penalty of perjury will satisfy the "statutory requirement." (*People v. Mayfield* (1997) 14 Cal.4th 668, 811.) While admittedly not a verified answer or a declaration, Perkovich filed a response. In the cases the majority cites, the challenged judge filed nothing. (*Urias v. Harris Farms* (1991) 234 Cal.App.3d 415, 419 [judge "did not respond"]; *Calhoun v. Superior Court* (1958) 51 Cal.2d 257, 260 ["no denial of the allegations by Judge Hewlicker"].)[4]

But most troubling of all is the majority's conclusion as to the claimed effect of this—that it "admits the truth of [the] allegations"—is that it disregards Presiding Judge Stone's order of November 7, 2014. There, he disqualified Perkovich, finding that her letter requesting recusal "does not satisfy the requirement of the filing of consent to the disqualification," and that "as a result of her failure to file a consent or a certified answer within the time allowed, Nancy Perkovich is deemed to have consented to her disqualification pursuant to Code of Civil Procedure section 170.3(c)(4)." But most significantly, Judge Stone's order held that "The court is making no finding as to whether

---

[4] As shown below (see fn 5), the majority notes, but excuses, that Tracy's attempt to remove Perkovich was not the correct document, not the required "statement of disqualification." No matter, the majority says, we'll consider it as proper. But not as to Perkovich's letter denying the charges and asking to be released. No, that was not the required "answer," and so the majority concludes Perkovich admitted all charges of bias. In other words, no need to hold Tracy to the letter of the law. Just Perkovich.

13

the allegations set forth in Petitioner Tracy Hayward's Request for Order re Motion for Disqualification, filed October 7, 2014, is true."

### *Canon 6(D) Does Not Support Disqualification*

As noted, the claimed noncompliance with Canon 6D was the focus of most of Tracy's position here. That position is treated by the majority almost as an afterthought, relegated to a brief discussion. Whatever the significance to the majority, the claim does not support disqualification.

I do not understand that a failure to comply with a Canon results in per se disqualification. The majority cites no law that it does. The law relied on by Jose holds it does not. (See, for example, *Wechsler v. Superior Court* (2014) 224 Cal.App.4th 384, 387 [judge not disqualified for failing to disclose potentially disqualifying information absent additional facts, even though disclosure required under Canon 3E(2)a]; *People v. Martinez* (1978) 82 Cal.App.3d 1, 16 [judge not disqualified even though his "intemperate and inflammatory remarks were totally improper, his conduct clearly violated canon 2A"].) So, the fact that Perkovich failed to make disclosures as required does not, without more, result in disqualification.

But beyond that, the majority assumes that there was noncompliance with the Canon, without any meaningful discussion of paragraph 4 in the Stipulation, that "Both parties waive the Clerk's minutes." That provision, I submit, could—and should—be read to say the parties expressly waived the Canon's requirement.

Under the Canon, the disclosure must be "in writing *or* on the record." (Italics added.) No question there was no "writing." But there is a real question whether "on the record" alternative was waived. As the majority recognizes, "The Committee on Judicial Ethics Opinions, which operates under the aegis of the California Supreme Court, has pointed out that one of the ways in which a disqualifying disclosure can be placed 'on the record' pursuant to canon 3E(2)(a) when there is no court reporter or electronic recording of the proceedings is to '[e]nter the disclosure document in the case file as a minute order, official court minutes, or a formal order.' (California Supreme Court, Committee on Judicial Ethics, *Disclosure on the Record When There is no Court Reporter or*

14

*Electronic Recording of the Proceedings*, Formal Opinion No. 2013-002 (Dec. 11, 2013) at p. 9.)"

As I understand it, Perkovich conducted the settlement conference in her office, with no court reporter, and no clerk, no one in the usual position who would create a "minute order, official court minutes, or a formal order." Perhaps Munsill and Blevans, both experienced and involved with private judging, provided for that in the Stipulation, agreeing that "Both parties waive the Clerk's minutes." What this means is nowhere discussed in the record, there being no testimony about it. The majority says, however unsupportedly, "[t]he obvious meaning of this brief sentence is simply that the parties intended to forego formal clerk's minutes for the proceedings to be held before the temporary judge." That may be the "obvious meaning" to the majority. The "obvious meaning" to me is that this is an agreement, by knowledgeable counsel, using words of art, to effect an express waiver.

The majority notes that Jose argues that "Tracy waived the on the record requirement." The majority rejects the argument based on Section 170.3, subdivision (b)(1), which the majority says "requires a waiver of disqualification to 'recite the basis for the disqualification' and to be 'signed by all parties and their attorneys and filed in the record.' (§ 170.3, subd. (b)(1).) No such waiver exists in the present case." This, I submit, is simply wrong, as section 170 (b)(1) applies only "when the judge determines himself or herself to be disqualified." Perkovich did not do that here.

But even if the record does not support an express waiver, it certainly supports an implied one.

### Any Claimed Disqualification Was Waived

There is no doubt that parties can waive disqualification by their conduct. (*People v. Johnson* (2015) 60 Cal.4th 966, 979–980 (*Johnson*); *Tri Cities Bank v. Superior Court* (2008) 167 Cal.App.4th 1332, 1337–1338 (*Tri Cities*); *In re Steven O.* (1991) 229 Cal.App.3d 46, 53–54.) Thus in *Johnson*, a capital murder case, the Supreme Court held that defendant waived his right to disqualify the judge based on the judge's close professional and personal relationship with the prosecutor when, at the outset of the

15

proceeding, and after full disclosure of the relationship, counsel agreed to proceed. (*Johnson, supra,* 60 Cal.4th at pp. 978–980.)

The majority observes that Tracy claims she did not hear Perkovich's disclosure. But even if she did not, it would not matter. Again *Johnson* is apt, where a unanimous Supreme Court noted that even if defendant was not properly told by his counsel about the judge's relationship, the right to challenge the judge is within "counsel's complete control of . . . strategies and tactics." (*Johnson, supra,* 60 Cal.4th at p. 980, italics omitted.)

*People v. Scott* (1997) 15 Cal.4th 1188 is similar. There, defendant argued he was not personally present when the circumstances giving rise to the waiver occurred. The Supreme Court held that defendant's "absence makes no difference. He was represented by counsel, who *was* present at the hearing. ' "When the accused exercises his constitutional right to representation by professional counsel, it is counsel, not defendant, who is in charge of the case. By choosing professional representation, the accused surrenders all but a handful of 'fundamental' personal rights to *counsel's* complete control of defense strategies and tactics." ' (*In re Horton* (1991) 54 Cal.3d 82, 95, original italics [holding that counsel may impliedly stipulate to trial before a court commissioner].) ' "An attorney may not sit back, fully participate in a trial and then claim that the court was without jurisdiction on receiving a result unfavorable to him." ' (*Id.* at p. 91.)" (*People v. Scott, supra,* 15 Cal.4th at p. 1207.)

Here, Tracy did not promptly seek Perkovich's disqualification even though she and her attorney Munsill knew on October 30, 2012 that the disclosures were not made on the record. They decided not to challenge Perkovich at the time, and in fact consented to her continuing as the private judge. This decision "came within the range of tactical decisions competent counsel may make"; it is "not to be second guessed." (*Johnson, supra*, 60 Cal.4th at p. 980.)

That waiver is present here is also demonstrated by Tracy's earlier attempts to have Perkovich removed.

16

As indicated in the majority, Tracy first attempted to have Perkovich removed on September 3, 2013, via a motion filed by attorney Jackson. Nothing was said about noncompliance with Canon 6(D), nothing about any claimed biased conduct or rulings. The motion was denied three weeks later.

Then, on May 30, 2014, represented by attorney Dolnick, Tracy filed what the majority calls a "second motion to withdraw the stipulation," in the words of the majority, "this time on the ground that, due to Ms. Perkovich's failure to certify that she was 'aware of and will comply with applicable provisions of canon 6 of the Code of Judicial Ethics and the Rules of Court,' as required by rule 2.83(b), she lacked the power to rule on the pending motion to enforce the MOA pursuant to section 664.6, and lacked judicial authority 'to make any of the determinations she has made in this matter to date.' The motion maintained that Ms. Perkovich's failure to provide the certification required by the Rules of Court provided 'good cause' permitting Tracy to withdraw the stipulation (Rule 2.831(f))." Again, nothing was said about claimed noncompliance with the Canon. And nothing about any claimed biased conduct or rulings by Perkovich, all of which had happened many months before.

Tracy's second motion to remove Perkovich was denied on July 11, 2014. She took a writ. We denied it. The Supreme Court denied review.

Only in Tracy's third attempt to remove Perkovich, filed on October 7, 2014, did Tracy make the claims as to noncompliance with the Canon and the claimed biased conduct the majority relies on here. This time, as the majority states, "Tracy's 'statement of disqualification'[5] was based on two separate grounds," those quoted above. And as to second ground, the majority describes it this way:

---

[5] Actually, Tracy's request was not a "statement of disqualification," and thus not the proper pleading. It was filed on a Judicial Council form "Request for Order," and characterized as a "Motion to Disqualify Nancy Perkovich." The proper form is a "Statement of Disqualification." (See *Urias v. Harris Farms, Inc., supra,* 234 Cal.App.3d at p. 421.)

17

"The second . . . was that any person aware of her conduct 'would have substantial doubt that Perkovich was or could be impartial,' and Perkovich should therefore be disqualified under section 170.1, subdivision (a)(6)(A)(iii).  In support of her bias claim, Tracy declared that Ms. Perkovich 'seemed to visibly favor' Jose and Blevans and 'took steps to block' Tracy's attorney from introducing evidence supporting her contentions . . . .  Tracy declared that Perkovich conveyed bias by her 'body language and her tone toward me and Mr. Jackson,' which 'was very different than it was toward Mr. Blevans and [Jose].  She was very standoffish, and regularly appeared to be visibly and noticeably annoyed with me' and 'often would stand over me with her arms crossed.  She would never make eye contact with me.  When [Jose] or Mr. Blevans spoke, Ms. Perkovich was relaxed and thoughtful, often making helpful comments or asking insightful questions that would help them fully develop the point they were trying to make.'  Ms. Perkovich also allegedly engaged in 'highly inappropriate' interactions with Blevans.  'For example,' Tracy stated, 'during the July 30, 2013, hearing, I personally saw Ms. Perkovich flirt with Mr. Blevans, proclaiming, "Oh Bob, that's so funny of you," while she batted her eyelashes at him,' and Perkovich and Blevans 'inappropriately spoke to each other about the case when my attorney was not present,' which Tracy assertedly learned from an invoice billing her for the time Ms. Perkovich spent on the phone, without Tracy's lawyer, in preparation for a hearing."

As seen, to the extent Tracy identified any date when any allegedly biased activity occurred, the latest date mentioned is "July 30, 2013," the day Tracy claims she saw Perkovich "flirt" with Blevans.  Her attempt at disqualification filed 14 months later was untimely.

**Any Claim for Disqualification Was Untimely**

In the express language of the disqualification statute, a party seeking disqualification must move "at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification." (§170.3, subd. (c); *People v. Guerra* (2006) 37 Cal.4th 1067, 1111; *People v. Scott*, *supra*, 15 Cal.4th at p. 1206.)  Failure to comply with the promptness requirement constitutes forfeiture or an implied waiver of

18

the disqualification. (*Tri-Counties, supra*, 167 Cal.App.4th at p. 1337; *In re Steven O., supra,* 229 Cal.App.3d at pp. 54–55.)  The Supreme Court has many times set out the reason for the promptness rule:  "[I]t would seem . . . intolerable to permit a party to play fast and loose with the administration of justice by deliberately standing by without making an objection of which he is aware and thereby permitting the proceedings to go to a conclusion which he may acquiesce in, if favorable, and which he may avoid, if not." (*People v. Scott*, *supra*,15 Cal.4th at p. 1207, quoting *In re Steven O., supra,* 229 Cal.App.3d at pp. 53–55.)  Those principles govern here.

Perkovich's claimed noncompliance with Canon 6D was in late October, 2012.  It was necessarily known at that time.  The claimed biased rulings and biased conduct were all known by mid-2013, October at the latest.  Tracy's request to disqualify was untimely.

### The MOA Cannot Be Set Aside as a Matter of Law

The majority's penultimate holding is that "the MOA was tainted by Ms. Perkovich's void rulings and is therefore unenforceable," a holding apparently made in response to Tracy's assertion that the MOA was the result of the "ultimate duress."  As the majority describes it, "Tracy emphasizes that the MOA was proposed in the wake of a series of adverse rulings issued by Ms. Perkovich after Munsill was replaced as her counsel by Jackson, who was unaware of the mutual judging relationships between Ms. Perkovich and Blevans.  According to Tracy, Blevans was aware of the hostility between Perkovich and Tracy and her counsel and, in that context, the MOA presented Jackson and Tracy a Hobson's choice . . ."  And so the majority finds such "taint," expressly doing so "as a matter of law."

I disagree, for reasons both legal and factual.

As to the legal, as noted, duress is a question of fact.  (*Kravitz v. BT Visual Images, supra,* 89 Cal.App.4th 164, 176.)  The majority cites nothing to the contrary.

As to the factual, the circumstances leading to the MOA are described in detail above.  To briefly recap, the MOA was signed in January 2014, following months of settlement discussions that resumed in August 2013.  The terms of the MOA were very much along the lines of a proposal Tracy had made, though one of the monetary terms

19

was increased. And the MOA followed an all day settlement conference on December 14 attended by Tracy and three attorneys on her side: Jackson, representing her, and Ian Carter and Eric Jeppson, representing her company. I do not understand how that can be duress as a matter of law.

That it is not is made is clear by *Rossco Holdings Inc. v. Bank of America* (2007) 149 Cal.App.4th 1353, the one case cited by the majority, a case the majority describes as follows: "As earlier described, the trial judge [Judge Williams] in the case disqualified himself after issuing an order compelling arbitration. The newly assigned judge vacated not only the order compelling arbitration, but also the subsequent arbitration award. While affirming that the disqualified judge's order compelling arbitration was void, the reviewing court reversed the order vacating the arbitration award as premature because the award was not necessarily improper: . . . [T]he arbitration award should be vacated only if the trial court determined that the arbitration was tainted by the disqualified judge, or should be vacated on other grounds. [Citation.]"

In other words, the Court of Appeal remanded for further proceedings, with the trial court to vacate the arbitration award "[o]nly if the trial court concludes that the arbitration was tainted by Judge Williams." (*Rossco Holdings Inc. v. Bank of America*, *supra*, 149 Cal.App.4th at p. 1367.) Or, to put it bluntly, "taint" is a question of fact.

### Some Closing Observations

I conclude with the observation that I have no dispute with the majority's laudatory characterizations of the goals of Canon 6D and the importance of having judicial decision-makers free from the suspicion of possible bias. And certainly I do not disagree with the majority that disclosure requirements must be taken seriously.

That said, I do disagree that a private judge's failure to make such a disclosure irretrievably taints everything done by him or her. No case I am aware of so holds, and I am not prepared to sign on to the first case that does, especially not in light of the facts here.

Moreover, I would not be surprised to learn that there may be cases where parties through their attorneys have chosen to proceed with a private judge—the respected

20

person they want, and trust, to decide their case—in which the private judge may not have strictly complied with Canon 6D, not making the required disclosure "in writing or on the record." If that is true, parties up and down California will wake up to a majority opinion that tells them that the orders under which they are proceeding with their financial affairs—not to mention, the custody of their children—are void. If, heaven forbid, that is the case, I can only imagine the havoc that will follow.

The majority goes where no court has gone before. I refuse to join them. And I dissent.


_____
Richman, J.

21

Trial Court: Napa County Superior Court

Trial Judge: Hon. Diane M. Price

Attorneys for Petitioner: Law Offices of Keith E. Dolnick
Keith E. Dolnick

Berger Kahn Law Corporation
David B. Ezra

Attorneys for Respondent: No Appearance For Respondent

Attorneys for Real Party in Interest: Blevans & McCall, LLP
Robert E. Blevans
Vanessa K. Wills